STATE of Utah, Plaintiff and
Respondent,

v.

Daniel Craig JARRELL, Defendant
and Appellant.

No. 15829.

Supreme Court of Utah.

Feb. 19, 1980.

John D. O'Connell, Salt Lake City, for defendant and appellant.

Robert B. Hansen, Atty. Gen., Craig L. Barlow, Asst. Atty. Gen., Theodore L. Cannon, Salt Lake County Atty., Salt Lake City, for plaintiff and respondent.

STEWART, Justice:

Defendant, Daniel Craig Jarrell, was convicted by a jury of attempted criminal homicide pursuant to § 76–5–201 U.C.A. (1953), as amended, a felony in the first degree. On appeal the defendant contends that the prosecution illegally suppressed certain evidence, that the cross-examination of the defendant was unfair and prejudicial in that it permitted inquiry into certain violent activities committed by the defendant at an earlier time, and that defendant's cross-examination of an expert witness was improperly curtailed. We affirm.

This case involves an unusual set of facts, characterized by both the prosecution and the defense as bizarre. To properly understand the nature and resolution of the legal issues, it is necessary to recite the facts in some depth.

On July 19, 1977, Caprice Bernson, a freshman at the University of Utah, drove to the Z.C.M.I. shopping mall in downtown Salt Lake City. She arrived there and parked the car she was driving on the fourth level in the mall parking garage at about 3:30 p. m. She went into the mall to do some shopping and returned around 5:00 p. m. As she was pulling out of her parking stall and proceeding to leave the garage, a man she identified as the defendant called to her and pointed out that she had a flat tire.

The defendant, a commercial airline pilot, was in Salt Lake City on business and to attend to some horses belonging to him which were stabled there. At about 4:00 p. m. the defendant drove to the Z.C.M.I. mall in a car he had rented earlier in the day. He parked it on the fourth level of the parking terrace and went to a previously-arranged meeting with a bank vice-president. Finding that the gentleman was not there, the defendant went to one of the department stores in the mall and purchased some supplies for his horses.

He returned to his rented automobile, inspected his purchases and tossed them into the back seat. He then opened the trunk of his car to get some letters from his briefcase. The defendant testified that he laid the briefcase on the floor of the trunk, took the letters from it, and shut the trunk lid, inadvertently locking the keys in the trunk. He was attempting to open the trunk with another set of keys when Ms. Bernson drove by with her flat tire.

After the defendant pointed out to Ms. Bernson the fact that she had a flat tire, Ms. Bernson pulled into the stall next to the defendant's rented car and remarked that she did not know how to change a tire. Defendant told her that he had locked his keys in the trunk and asked if he could try her car keys in his trunk lock. Ms. Bernson's keys failed to open the lock.

The defendant then offered to change Ms. Bernson's tire. Ms. Bernson opened the trunk of her car and pulled the spare tire down into the bed of the trunk. She noticed nothing unusual about the spare at this time. The defendant removed the tire from the trunk and began the tire-changing process. Ms. Bernson offered to call the car rental company from whom defendant rented his car to see if she could obtain a key for him. She went into the mall to make the phone call and was informed by the car rental company representative that she needed to tell him the license number.

As she returned to her car, she observed that the trunk of the defendant's car had been pried open and that the defendant was jumping up and down on her spare tire. Ms. Bernson could hear air escaping rapidly from the tire as she approached it. At trial, expert testimony was admitted to the effect that both the left front tire and the spare tire of Ms. Bernson's car had been punctured by an object that pierced the tires and came back out. One expert witness opined that both the tires had been purposefully punctured with the same object.

The defendant tried the spare tire on the left front wheel, but it did not have enough air in it to function adequately. The spare tire from the defendant's rented car was also tried without success. During the course of these tire changes, Ms. Bernson and the defendant conversed about their respective occupations and backgrounds. Ms. Bernson testified that this conversation did not alarm her or make her suspicious of the defendant.

Because neither spare tire worked, Ms. Bernson decided to call her parents. The defendant told her that it was unwise to leave her car jacked up with no tire on the wheel, and he lifted the tire onto the car for her. She squatted down to place the lug nuts on, with defendant standing immediately behind her. It is at this point that the two versions of the events that took place diverge.

According to Ms. Bernson, during the following few minutes the defendant remained near her, and they continued to converse while she was working with the lug nuts. Then, without warning, Ms. Bernson was struck on her head and fell to the ground. She was knocked prone and remembered looking underneath her car. She also remembered that she lay there for a "few seconds" and then managed to raise herself to her hands and knees, looked over her shoulder, and observed the defendant with the tire iron cocked over his shoulder with "an evil look on his face . . . like he was out to kill." He swung the tire iron at her, but Ms. Bernson swayed out of its path. The blow missed her head, but struck her hand on the pavement, almost severing her middle finger. She scrambled to her feet and ran to the elevator. As she hid behind a wall near the elevator, she heard a car "screech" away. She then made her way to the mall and received medical attention there.

The defendant's version is that as Ms. Bernson began to replace the lug nuts, he walked towards the mall to make a phone call. After walking about 30 feet, he turned back to ask her if she needed any help when a tall, blonde man placed a gun at his back. At trial the defendant said that he could not observe the gunman or the gun clearly, although the prosecution introduced rebuttal testimony that at an earlier interview defendant had unhesitatingly identified the gun as a .38 snub-nosed revolver. Then the gunman allegedly ordered him back to his car. As they approached the space between the two vehicles, Ms. Bernson became visible. The distance between the two cars was about three and one-half feet, with defendant only about two feet from Ms. Bernson. Despite the close proximity, Ms. Bernson did not hear a third person or any of the commotion that allegedly ensued.

According to the defendant, the gunman pushed the defendant forward with his right hand, the same hand in which he was holding the gun, and apparently simultaneously struck Ms. Bernson with something in his left hand which the defendant thought could have been the tire iron they had been using to change the tires. As she attempted to get to her feet, the gunman again pushed the defendant with his right hand and simultaneously struck Ms. Bernson. Then she managed to get to her feet and run away.

The defendant testified that as Ms. Bernson ran from the area, the gunman ordered him to get in his car and drive away. Defendant got behind the wheel of his rented automobile, and the gunman allegedly got in the back seat. The defendant exited the mall parking terrace and drove east on South Temple Street. A prosecution rebuttal witness, Barbara Plewe, testified that her car was struck in the rear as she was leaving the parking terrace on the 19th of July between 5:30 and 6:00 p. m. She saw the car that hit her pull out and pass on her left just inside the exit of the parking terrace. As the car passed her, she observed its color, the license plate number, and that it had some damage to the trunk area. She followed that car onto South Temple Street for some distance in order to make sure that she had correctly observed the license number. From the time the car left the parking terrace until she was no longer able

to follow it after it turned left on "A" Street, Ms. Plewe did not observe anyone in the car except the driver.

The defendant said he drove toward the northeast "avenues" area of Salt Lake City and then was ordered by the gunman to pull over. There, he allegedly stopped the car, jumped out and ran, leaving the car with its engine still running. The defendant then ran back to the mall and reported the incident. The gunman did not rob him despite the fact that defendant was carrying over a thousand dollars in cash. The vehicle was later found at the same location by the police. All of its windows were rolled up and its doors locked. The back seat area did not appear to have been disturbed. A "flat," "new" piece of paper was found on the rear floorboard where the gunman allegedly had entered.

After Ms. Bernson received first aid at the mall, she was taken to the emergency room at LDS Hospital where she was examined at about 6:10 p. m. The physician who treated her, Dr. Peter Midgley, testified that she had received two blows to the head—one behind the left ear and one to the top of the head—and one blow that almost severed the middle finger of the right hand. The blows to her head had been delivered with a great deal of force but were not fatal because they were glancing blows, striking her skull at an angle rather than perpendicularly. She was thoroughly examined and exhibited no signs of skull fracture or concussion. She appeared to Dr. Midgley as "well oriented," "alert," and "lucid."

At trial, during direct examination of the defendant, defense counsel (not the same lawyer who represented the defendant on appeal) asked several questions regarding the nature and extent of defendant's involvement in the "quasi-military war in Cambodia and Laos" in the early 1970's. Defendant revealed that he had participated in clandestine activities for the government of Thailand, that he had training in the martial arts, and that in the course of his activities he had killed at least six people; one he had killed with his "bare hands." The purpose of this direct examination was apparently to support the defense theory that because of his background and skills, had defendant been Ms. Bernson's assailant as she testified, he would have killed her.

On cross-examination, after the defendant had volunteered that his quasi-military activities took place in Africa as well as Southeast Asia, the prosecution asked him if he had killed anybody in Africa. Defendant indicated that he had, although he was unable to say how many lives he had taken. Further examination revealed that the defendant had gone to Africa "for the purpose of retrieving certain individuals," that his mission had something to do with the Ugandan leader Idi Amin, that he had not been involved in an attempt to assassinate Amin, and that he had come in contact with one of Amin's relatives. Defense counsel first objected to the questioning when the prosecutor asked with which relative of Amin's had the defendant come in contact. The trial court overruled the objection on the ground that defense counsel had opened the area to cross-examination. The prosecutor then elicited from the defendant that he had been involved in the kidnapping of Idi Amin's son and that the kidnappers had eventually let him go. This line of questioning concluded with defendant's admission that he was "no stranger to violence."

Two police officers who had been called to the scene to investigate the assault testified on behalf of the prosecution. They had each filed, shortly after their investigation, a report with the police department giving the details of the incident as they had been related to them and what they personally had observed. Although both officers specifically referred to their respective reports in their testimony on the stand, defense counsel did not request copies of the reports until well after the trial was completed.

Officer Earl Price indicated in his report that when he questioned Ms. Bernson at LDS Hospital she was "conscious" and "very coherent," and "she knew what time it was, she knew what the day was, what the month was, she seemed to be very

aware of what was going on. She was very sure of the things that she was telling me." At trial, Officer Price testified that he had first questioned Ms. Bernson in the mall parking garage immediately before she was transported to the hospital. At that time she was "very coherent, knew exactly what was going on." After following her ambulance to the hospital, Officer Price continued his questioning. He testified that at the hospital he was "quite amazed at her ability to talk and function" in view of her injuries. In his report, however, Officer Price also indicated that "Ms. Bernson [had] stated that she may have blacked out for a second [after being hit on the head the first time] but not very long at which time something told her to get up."

Officer Brent Elcock testified that when he first observed Ms. Bernson in the mall parking area, she was "very conscious, coherent, aware of what was going on" as she described the suspect. According to Officer Elcock, when the defendant reappeared at the mall parking area, he approached Ms. Bernson. Upon seeing him, Ms. Bernson became "hysterical" and screamed "don't let him hurt me." Officer Elcock's report was not as specific as his testimony. His report did not distinguish how Ms. Bernson acted before or after she saw the defendant while she was still in the mall parking area; it mentioned only that she was "very incoherant [sic] apparently under severe strain and shock from the incident."

On appeal defendant raises three claims of error: (1) the prosecution failed to divulge a police report which contains allegedly exculpatory evidence; (2) the trial court erred in permitting cross-examination of the defendant regarding his involvement in the quasi-military kidnapping operation in Africa; and (3) the trial court unduly restricted cross-examination of the victim's treating physician, Dr. Midgley.

### I.

We turn first to the contention that the prosecution improperly failed to divulge two police reports made by the investigating officers shortly after they had investigated the crime. These reports, it is contended, contain statements pertaining (1) to the ability of the victim to perceive accurately the crucial events of the attack, and (2) to the veracity of the investigating officer's testimony.

Defendant argues that it was important to his defense for him to have been able to establish that Ms. Bernson lost consciousness, with the probability of amnesia and confusion pertaining to the events occurring at the time she received the blows to her head. He claims that during the few moments she allegedly lost consciousness she was unable to hear or see the gunman who hit her. According to him, the two police reports contained evidence which tends to exculpate him. He argues that Officer Elcock's written statements that Ms. Bernson was incoherent and apparently under severe strain are inconsistent with the officer's testimony at trial as to her mental state and would have been helpful both for impeachment purposes and for cross-examination of the victim and the medical expert.

With respect to the account in Officer Price's report that Ms. Bernson said she may have "blacked out for a second," defendant contends that this statement conflicts with the prosecutor's theory that her powers of perception and memory were not substantially impaired by the blow to her head.

Defendant concedes that he did not request production of the above-mentioned reports prior to the trial. He claims that he did not become aware of their existence until after the trial, despite the fact that both officers specifically referred to the reports during their testimony.

The question as to what duty a prosecutor has to disclose allegedly exculpatory evidence in a criminal case depends on the nature of the evidence, whether the defense made a specific request for the evidence, whether the evidence is perjured, whether the defense knew, or, using reasonable diligence, should have known, about the evidence, and, to a certain extent, the conduct

of the prosecution. The underlying concern is, of course, to make the judicial process a search for truth and not just an arena of competition between the prosecution and the defense. For that reason the adversarial process, which generally serves well the judicial process, must yield to the quest for truth, if there is a conflict.

■ Both the United States Supreme Court and this Court have dealt with the standards that should be applied in determining whether evidence should have been disclosed by the prosecution. In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Court held that the prosecutorial suppression of evidence favorable to the accused, in the face of a specific request for the evidence, violates due process if the evidence is material either to guilt or to punishment. Good faith of the prosecution in such an instance is irrelevant. Accord, *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). In *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), the Court first addressed the situation involving a prosecutor's use of testimony which he knows or should know is perjured. Decisions following *Mooney* have held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Apart from prosecutorial misconduct involving false testimony, nondisclosure resulting from the failure of the police or other members of the prosecutorial team to inform the defense attorney of exculpatory or other relevant evidence may also result in a violation of due process. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Barbee v. Warden*, 331 F.2d 842 (4th Cir. 1964).

■ This Court has recognized that a deliberate suppression by the prosecution of evidence which is material to the guilt or

innocence of a defendant in a criminal case is a denial of due process. *State v. Stewart*, Utah, 544 P.2d 477 (1975); *Butt v. Graham*, 6 Utah 2d 133, 307 P.2d 892 (1957). But see *Ward v. Turner*, 12 Utah 2d 310, 366 P.2d 72 (1961), and its companion case, *Turner v. Ward*, 321 F.2d 918 (10th Cir. 1963).

■ *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), extended the rulings of *Brady, Moore*, and *Mooney*. *Agurs* concerned the duty of a prosecutor to disclose exculpatory evidence which is unknown and unrequested by the defendant.[1] The Court held that a prosecutor has a constitutional duty to volunteer obviously exculpatory evidence and evidence that is "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce," 427 U.S. at 107, 96 S.Ct. at 2399. Specifically, the Court held that due process is violated if the undisclosed evidence, had it been disclosed, would have created a reasonable doubt as to defendant's guilt. Whether the evidence created a reasonable doubt must be evaluated in light of the entire record as viewed by an appellate court:

> If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. [*Id.* at 112–13, 96 S.Ct. at 2402.]

Plaintiff contends that the nondisclosure of the police investigative reports in this case by the prosecution requires a new trial under *Agurs*. We hold it does not.

In this case, the statements contained in the police reports, about which the defendant complains, are impeaching evidence because they relate to the victim's perception of her assailant and may be construed as inconsistent with some of her testimony and the testimony of the officers at trial. As it turned out, the victim's ability to accurately

---

1. *United States v. Agurs* extends also to evidence which the defendant requests only generally, e. g., the defendant requests "anything exculpatory" in the prosecutor's files. The Supreme Court held that this "*Brady* request" should be treated as if no request were made.

identify her attacker and otherwise perceive what was happening during the attack was important to the defense theory of the incident. The defendant urges upon this Court that this was a close case, as evidenced by the fact that the jury deliberated over seven hours before reaching its verdict, and that it was therefore critical for his trial counsel to have the information in the police reports.

■■■ The overriding concern in cases involving prosecutorial nondisclosure of evidence which tends to exculpate the defendant is the defendant's right to a fair trial. In a criminal trial it is essential that evidence which tends to exonerate the defendant be aired as fully as that which tends to implicate him. To that end, the State, in vigorously enforcing the laws, has a duty not only to secure appropriate convictions, but an even higher duty to see that justice is done. *Codianna v. Morris*, Utah, 594 P.2d 874 (1979). Balanced against this interest is the burden on the prosecutor to anticipate the usefulness of the evidence contained in his files. Even the most conscientious prosecutors may sometimes fail to appreciate the significance of some evidence in the hands of a skilled defense counsel or may forget that it exists when an unexpected development in the trial gives it new importance. See *United States v. Agurs, supra,* dissenting opinion of Mr. Justice Marshall, 427 U.S. at 114, 96 S.Ct. at 2402; *United States v. Keogh,* 391 F.2d 138 (2d Cir. 1968). A fair-minded prosecutor is not likely to be aware of all potential evidence which a defendant may think relevant, and we do not think it reasonable, given the adversary nature of the criminal process, to require a prosecutor to disclose all evidence which might possibly be useful to the defense but which is not likely to have a foreseeable effect upon the verdict. Such a requirement would create unbearable burdens and also uncertainties with respect to the finality of judgments.

The same concerns of safeguarding the defendant's right to a fair trial exist regardless of whether the undisclosed, exculpatory evidence is false or perjured testimony or whether it is merely contradictory to the evidence elicited by the prosecution at trial. The majority in *Agurs* approved the standard of materiality in cases in which the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew or should have known of the perjury, to be whether "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397. The Court justified the lesser burden on the defendant in such cases, not just because of prosecutorial misconduct, but more importantly because "they involve a corruption of the truth-seeking function of the trial process." *Id.* at 104, 96 S.Ct. at 2397.

■■■ In any event, we are unwilling to adopt a rule that permits defense counsel, by withholding a request for available evidence, to in effect corrupt a trial and thereby obtain a retrial. In the instant case the reports clearly could have been requested. The existence of police reports must have been known prior to trial and were referred to at the trial. Both investigating officers testified, and both expressly referred to the reports they had made at the scene of the crime. Generally, evidence is not improperly withheld if the defense has knowledge of that evidence and defense counsel simply fails to request it. *Butt v. Graham, supra; United States ex rel. Thompson v. Dye,* 123 F.Supp. 759 (D.C.D.C. 1954). The record is silent as to whether the defendant actually sought or viewed the reports in this case. In any event, the failure by the officers or the prosecution to volunteer the reports in this case does not indicate impropriety by the police or the prosecution.

More importantly, in light of the totality of the evidence, the disclosure of the reports to defendant at trial would not have raised a reasonable doubt as to the guilt of the defendant. Four witnesses, including Ms. Bernson, testified regarding her mental state during or immediately after the assault. She testified that as she began to tighten the lug nuts on her wheel, she "felt

a big bang on [her] head" and fell to the ground.[2] She remembered lying flat on the ground on the right side of her face and looking underneath the car. She recalled that she lay there "for a very few seconds," feeling "amazed" that she had been hit. She testified that she raised herself to her hands and knees, looked over her shoulder, and saw the defendant holding the tire iron in both of his hands cocked over his right shoulder ready to swing. She remembered and described the look on his face. She testified that she did not lose consciousness, that her vision was unobstructed and not blurred, that she was not dizzy or disoriented and that she was in control of all her faculties when she saw the defendant about to hit her. She said she had a distinct, unclouded and undistorted recollection of the incident. She had no doubts in her mind that it was the defendant who hit her. Finally, Ms. Bernson testified that there was no one else with the defendant when she saw him ready to swing at her with the tire iron.

Dr. Midgley, the attending physician, testified that Ms. Bernson did not seem to have suffered a concussion which could have caused her to lose memory of the events immediately surrounding the blows to her head. He said that she did not suffer a skull fracture or any brain injury. Dr. Midgley stated that a person can suffer a substantial blow to the head, not lose consciousness, and be able to retain all his perceptive faculties. On cross-examination

he emphasized that it is not unusual for a person who has sustained a severe injury not to feel the injury. Often, he elaborated, ". . . when severe injury is applied to tissue, the tissue is immediately anesthetized and you are not particularly aware of what it was." He also stated that if a person felt nothing at all it could be because the person was unconscious or unaware of what was going on. He did not give an opinion as to whether Ms. Bernson lost consciousness, although he did explain that it was not likely a person receiving blows like Ms. Bernson's would misperceive externally occurring circumstances:

> I think we have to distinguish here between misperception of the thing that caused the injury and misperception of other externally occurring circumstances. If the person were knocked unconscious I think it is pretty obvious they may very well either not be aware or misperceive virtually everything going on around them until their brain was restored to normal functioning. *The fact that somebody gets a glancing blow to the head which produces no injury to the brain, no unconsciousness, does not necessarily—in fact, I can't say would with even any great likelihood cause them to misperceive something going on somewhere else.* Emotional excitement might cause someone to see things differently than some other observer would. [Emphasis added.]

Officer Elcock's report contained Ms. Bernson's statement that she "may have

---

2. On cross-examination she said she did not actually feel the hit, although it appears that she somehow knew she was being struck:

> Q Okay. And then I think you testified, Miss Bernson, that you felt a blow to your head.
> A yes.
> Q Do you know whether you felt one blow or two blows or more than two blows?
> A I didn't even feel the first hit. All I knew is I was down on the ground and then I was looking under the car. I remember looking under the car.
> Q Are you telling us that you didn't feel the blow to your head?
> A I didn't really even feel it because it happened so fast and I was just laying there and then I got up and looked over and that is when I saw him.

> * * * * * *
> Q You didn't feel anything hit you, but you felt yourself on the ground?
> A Yes.
> * * * * * *
> Q So you felt no hit, you heard no words, you just found yourself on the ground?
> A Yes.
> * * * * * *
> Q Do you believe you were struck twice?
> A Yes.
> Q But you don't recall feeling—
> A No.
> Q —two blows, you don't recall any blows?
> A I felt—well, I just—no, I don't.
> Q Did you have a headache?
> A No. I felt nothing at all. I was just amazed that it was happening.

blacked out for a second," which defendant contends would have created a reasonable doubt as to whether she lost consciousness when she was first hit and thus was prevented from seeing the gunman. We do not agree with defendant's contention because this statement, even assuming it to be an accurate representation of what Ms. Bernson said, is not persuasive enough to raise a reasonable doubt when weighed against (1) her testimony that she did not lose consciousness, (2) the detailed nature of her recollection of the incident, and (3) the doctor's testimony that he did not think it likely that her injuries would cause her to lose consciousness. And in any event, even assuming the accuracy of the officer's written observation, the statement is not necessarily inconsistent with the victim's power to perceive in a manner consistent with her trial testimony.

Defendant maintains that the materiality standard enunciated in *United States v. Agurs, supra,* does not apply because in the instant case the prosecutor used testimony which he knew or should have known was false or perjured. There is no foundation in the record to support that accusation.

Every lawyer, indeed every intelligent layman, recognizes that minor discrepancies may occur in statements made by one person at different times. Indeed, the statement in Officer Elcock's report that Ms. Bernson was "very incoherent apparently under severe strain and shock" may well refer to how she reacted when she saw the defendant approach her just before she was transported to the hospital. According to Officer Elcock at trial, Ms. Bernson was coherent prior to seeing the defendant but that after seeing him approach, she became "hysterical." [3] The report does not specify to what point in time his statement refers.[4] Hysteria can of course affect perception. But the report in this case seems to indicate that the hysteria occurred *after* the victim saw the defendant returning to the scene of the crime. But the defendant, having failed to ask for the documents, now seeks a reversal based on the contention that the prosecutor should have done what defense counsel could have accomplished. In any event the evidence recited in footnotes 4 and 5 indicates that the trial testimony of Officer Elcock and his report are not inconsistent.

Taking the evidence as a whole, we conclude that disclosure of the police report would not have raised a reasonable doubt as to the validity of the verdict. Testimony of both officers and Ms. Bernson reveals their

3. When Officer Elcock arrived on the scene, Ms. Bernson was lying on the floor being treated by paramedics. She was bleeding from her head and her right hand. Officer Elcock questioned her and had just obtained a physical description of her assailant when the defendant reappeared. Officer Elcock testified as follows:

Q (BY MR. NIELSON) And when did you first see him?

A I just finished talking to the victim, getting a description of the suspect. As I stood up from where I had been kneeling talking to her a citizen had hold of Mr. Jarrell and they both approached me.

Q And how did he appear when you first saw him?

A He had sweat coming off of his forehead and face, very excited, nervous, hands very dirty, his pants dirty, very defensive.

Q Did the victim to your knowledge see the defendant at that time?

A Approximately thirty seconds later.

Q And was there a reaction on her part at that time?

A Yes, there was.

Q What was that reaction?

A She pointed at him stating that is him. She became hysterical, don't let him hurt me, she was saying.

4. The pertinent portion of the report does not distinguish whether the victim was incoherent when the officer first saw her or whether she became incoherent upon seeing the defendant approach her:

Reporting officer was dispatched to ZCMI Mall, State Street entrance in front of Ziniks on an assault that had just occured [sic]. I was dispatched at 5:33 arriving 5:34. As this officer approached the scene he found the victim laying on the mall floor, paramedics attaching a bandage on her head, also on her right hand. She had two what appeared to be wounds toward the right top of her head and also a laceration on her right midd'e finger. The victim was very incoherant [sic] apparently under severe strain and shock from the incident.

\* \* \* \* \* \*

This officer took Mr. JARRELL to the side who related [his version of the] story.

consistent reports that Ms. Bernson was alert, aware and coherent immediately following the assault. Despite whatever inconsistency might be assumed between Officer Elcock's testimony and his written report, we cannot conclude that production of the report would probably have changed the result.

## II.

We turn next to the issue of the scope of cross-examination.

The defendant testified on his own behalf. On direct examination defense counsel asked defendant several questions regarding his involvement in "quasi-military" activities in Southeast Asia. Among other things, the defendant revealed that he was familiar with the martial arts, that he had participated in clandestine activities for the government of Thailand and that he had killed six people—one with his bare hands. The defense strategy for opening up this area of testimony was to show the physical prowess of the defendant and hence the likelihood that it was a gunman using his left hand rather than the defendant who committed the "inept" assault on Ms. Bernson. On cross-examination the court permitted the prosecutor to ask questions which defendant claims went beyond the scope of direct examination and were irrelevant and prejudicial.

In *State v. Green*, Utah, 578 P.2d 512, 514 (1978), this Court stated that if a defendant chooses to testify in his own behalf

> . . . he then becomes subject to being treated the same as any other witness. This includes cross-examination on any matter which would tend to contradict, explain or cast doubt upon the credibility of his testimony. Furthermore, any testimony or evidence which is purposed to those same objectives may be introduced in rebuttal.

██ Broad discretion is allowed in cross-examination of a defendant who has opened up an area on direct examination. *State v. Studham*, Utah, 572 P.2d 700 (1977). In the instant case, the defendant himself opened the area relating to his "quasi-military" experiences in Southeast Asia and Africa. On cross-examination, prior to any objection by defense counsel, the prosecutor elicited from the defendant that defendant had killed people in Africa, that he had gone there for the purpose of "retrieving certain individuals," that his mission had something to do with Idi Amin, that he had not been involved in an attempt to assassinate Amin, and that he had come in contact with one of Amin's relatives. When defense counsel objected, the court overruled the objection on the ground the defendant had opened the area. Under further questioning by the prosecution, the defendant then revealed that he had been involved with a kidnapping of Idi Amin's son and that he had eventually released him. The defendant then stated that he had killed people in Africa with an automatic gun and that he could not remember how many people he had killed there. Finally, he admitted, also on cross-examination, that he was no stranger to violence.

██ The objection to this testimony appears to arise out of the failure of the jury to accept the defendant's theory. Whatever was elicited on cross-examination was limited to areas opened up by the defendant and tended to support defendant's strategy. The quasi-military activities in which defendant was involved in Africa were similar to those in Southeast Asia, and the defendant had apparently used similar combative skills in both places. Whether these "quasi-military" activities were crimes or not, we do not retreat from the rule that evidence of prior crimes is inadmissible, except in certain exceptions not relevant here, in holding that there was no error in allowing the prosecution to explore questionable activities which had been opened up on direct examination.[5] Although there may well be

---

5. Defendant cites Rules 47 and 55, Utah Rules of Evidence, and several cases to support his claim that evidence of crime other than that for which the defendant is charged is inadmissible to prove a propensity to commit crime. See *State v. Goodliffe*, Utah, 578 P.2d 1288 (1978);

*State v. Gillian*, 23 Utah 2d 372, 463 P.2d 811 (1970); *State v. Huggins*, 18 Utah 2d 219, 418 P.2d 978 (1966); *State v. Kazda*, 14 Utah 2d 266, 382 P.2d 407 (1963), and *State v. Dickson*, 12 Utah 2d 8, 361 P.2d 412 (1961).

times that in the interest of fairness and avoidance of prejudice, a trial court should limit cross-examination of a defendant into areas of criminal conduct even though the general topic was opened on direct examination, there clearly was nothing elicited on cross in this case that suggests that the proper limits were transgressed.

### III.

Defendant's third claim of error is that the trial court made various improper rulings with respect to defense counsel's cross-examination of Dr. Midgley. Defendant contends that it was critical to his defense for him to have been able to establish the possibility that Ms. Bernson lost consciousness or misperceived the events immediately following the first hit to her head, that she was unable to see or hear the gunman and could not therefore accurately identify her assailant. Defendant asserts that the limitations imposed by the court's rulings denied him his constitutional rights of confrontation and effective assistance of counsel under the Sixth Amendment to the United States Constitution and Article I, § 12 of the Utah Constitution.

On direct examination, Dr. Midgley described Ms. Bernson when she was admitted to the emergency room of the hospital as "conscious," "lucid," "well-oriented," and "alert." She had no skull fracture and did not show signs of having sustained a concussion or any "abnormal neurological symptoms." The doctor stated that, based upon his experience and background, a person could suffer a substantial blow to the head and not lose consciousness and retain all his perceptive faculties immediately thereafter.

On cross-examination the defense counsel attempted to distinguish the various medical consequences of a substantial blow to the head. The doctor first stated that a person could sustain a very severe injury and feel only a slight sensation. If a person sustained a severe injury and felt nothing at all, however, the doctor said,

You would have to assume that the person was unconscious or unaware of what was going on . . . . .

As to whether there would be a reasonable medical probability that a person receiving Ms. Bernson's blows would be disoriented or misperceive things that happened at about the same time of the blow, he said,

I think we have to distinguish here between misperception of the thing that caused the injury and misperception of other externally occurring circumstances. If the person were knocked unconscious I think it is pretty obvious they may very well either not be aware or misperceive virtually everything going on around them until their brain was restored to normal functioning. The fact that somebody gets a glancing blow to the head which produces no injury to the brain, no unconsciousness, does not necessarily—in fact, I can't say would with even any great likelihood cause them to misperceive something going on somewhere else. Emotional excitement might cause someone to see things differently than some other observer would.

Defense counsel then asked if the doctor had an opinion based upon reasonable medical probabilities whether, assuming Ms. Bernson had received the blows with the tire iron, she could have "misinterpreted," "misperceived," not recalled, or had a "fuzzy memory" about the events at or about the time of the blows. The court properly sustained an objection to this question on the grounds that it was compound and also repetitious as to one of the questions. Defense counsel, without rephrasing the question, then proceeded to ask a series of questions concerning the force and angle of the blows and the likelihood they could have caused death. In essence, the doctor answered that the force behind the blows was great, but because of the angle at which the blows hit, the likelihood of death resulting was low. Defense counsel's next

question was whether the force used to cause the injuries to Ms. Bernson would likely have caused a "concussion or fracture of the skull." The court sustained an objection to this question on the ground that it was repetitious. Defense counsel said that he did not recall how the doctor had answered and asked if the court reporter could read back his answer to the question. The court denied this request, but told defense counsel that he could ask more questions if he did not understand. Defense counsel then asked if, based upon reasonable medical probabilities, the doctor had an opinion as to whether the blows would be sufficient to cause "disorientation or hallucinations or loss of vision, things of that nature." The court sustained an objection to this question as being repetitious.

■ Defendant argues that his right of cross-examination was improperly curtailed because he was denied the opportunity to clarify the doctor's testimony with respect to the immediate physical consequences Ms. Bernson might have sustained as a result of the blows to her head. Specifically he claims that the court erroneously believed that skull fractures, concussions, loss of consciousness, misperceptions, disorientation, and hallucinations are synonymous and interchangeable. Clearly defense counsel must be allowed ample elbowroom in conducting cross-examination. In this case the trial court might well have been more liberal in permitting cross-examination to proceed uninterrupted, even though the defense counsel's questions were not phrased in a classic textbook fashion.

■ Nevertheless, the trial court's rulings do not amount to error. Indeed, as to defendant's compound question whether the blows would cause "disorientation or hallucinations or loss of vision, things of that nature," the trial court indicated that the question was repetitious only as to one of the symptoms queried. In any event, defense counsel was not precluded from engaging in an effective cross-examination because the trial court clearly indicated that the question could be rephrased.

Defendant also claims error in that he was required to phrase his questions to the doctor in terms of a "reasonable medical certainty or probability," and that this ruling is not consistent with the fundamental proposition that he had no burden of affirmatively establishing the existence of a fact, but only needed to establish a reasonable doubt as to guilt to be acquitted.

■ The general rule regarding the certainty of an expert's opinion is that the expert may not give an opinion which represents a mere guess, speculation, or conjecture. See 2 *Jones on Evidence*, § 14:29 (6th ed. 1972). Expert medical opinion evidence based on a probability, possibility, or likelihood has been admitted, however, where the witnesses expressed statements in language which sufficiently represented their own best judgment to a reasonable certainty. *Jones on Evidence, supra*, at 663–64, explains the distinction as follows:

> Although there are limits as to how uncertain an expert may be in his opinions there is still the question of how certain he may show himself to be with respect to them. . . . [T]he witness may use such language as expresses his actual state of mind on the matter, whether it be in terms of possibility, probability, or actuality. This is commonly described as testimony that a result might, could or would follow from a given state of facts. [Citations omitted.]
>
> Whether opinion may be merely in terms of possibility depends on how closely possibility resembles speculation; so that ordinarily the opinion should at least be stated in terms of probability if not absolute certainty. [Citations omitted.]

In *Hooper v. General Motors Corp.*, 123 Utah 515, 521–22, 260 P.2d 549, 552 (1953), this Court in a civil case held it was not error for an expert to give an opinion on the cause of a mechanical failure in terms less specific than the term "reasonable probability" denotes. The Court stated:

> We are of the opinion that within the realm of his knowledge an expert may express an opinion as to what did cause a particular occurrence or condition and in

so testifying *his opinion may be cast in the form of "what did" cause, as well as "what might" or "what could" have caused a particular occurrence or condition,* depending upon the degree of positiveness the witness desires to give his opinion. [Emphasis added.]

The lion's share of the decisions concerning the certainty of expert opinion evidence have arisen in the context of civil disputes. Criminal proceedings should not, as far as defense testimony is concerned, require a higher standard of certainty as a condition of admissibility because of the different burden of proof. In a criminal case all a defendant need do to avoid a conviction is raise a reasonable doubt as to any of the elements of the offense. Certainly reasonable doubt might be founded on something less than testimony which must be phrased in terms of "reasonable certainty."

Although the parties do not cite authority for the standard of certainty necessary for expert opinion evidence to be admissible on behalf of a defendant in a criminal trial, independent research on the part of this Court has revealed decisions in which courts have permitted expert opinion evidence based on a *possibility* in criminal cases. See *Copeland v. State,* 58 Fla. 26, 50 So. 621 (1909); *Wilson v. State,* 181 Md. 1, 26 A.2d 770 (1942); *Shanks v. State,* 185 Md. 437, 45 A.2d 85 (1945), and *State v. Beaudin,* 76 Wash. 306, 136 P. 137 (1913).

 Therefore, in a criminal prosecution a *defendant* should be allowed to introduce both expert opinion evidence and cross-examine the prosecution's expert witness on the basis of questions seeking to establish a reasonable possibility, founded, of course, on the facts of the case. It would not, however, be appropriate to permit mere speculation or a statement as to the existence of abstract possibilities. Testimony as to a reasonable possibility by an expert should indeed be based on what is reasonable within the factual and legal issues in the cases. This type of testimony is not only required because of the standard of proof in a criminal case, but it also allows an expert the verbal latitude of expressing a conclusion in a fashion that best fits the relative degree of certainty to which the opinion is entitled.

 However, in the instant case, defense counsel, on his own, formulated his questions in terms of a reasonable medical certainty or probability. On direct examination of Dr. Midgley, the trial court did order the *prosecutor* to frame his questions in this manner, but on cross-examination defense counsel, without being required to do so by the court, three times asked the doctor for his opinion based upon a reasonable medical probability.

In fact, at no time did the trial court prevent the defendant from asking questions concerning reasonable medical possibilities, nor did defense counsel attempt to put such a question. Defendant's argument seems to be based on an interchange in which the trial court interrupted a question to an expert and which clearly called for an opinion but was not phrased in terms of the opinion of the expert. The trial court instructed counsel to phrase the opinion in terms of an opinion as to a reasonable medical probability—which was the standard he had incorporated into his defective question.

But even accepting the premise of defendant's contention, it is nevertheless clear that defendant was not deprived of the type of evidence he sought. The doctor testified that it was possible one blow with the tire iron *could* have caused the wounds to Ms. Bernson's head and that it was *possible* someone receiving the blows like those sustained by Ms. Bernson would misperceive events occurring at the same time of the blows. Moreover, the general thrust of defendant's complaint—that he was unable to elicit whether Ms. Bernson might have lost consciousness when she was struck and was thus unable to accurately identify her assailant—was addressed by the doctor. Dr. Midgley testified that if Ms. Bernson felt no blows, then he would have "a very difficult time explaining that." He added that if a person felt no blows at all, "you would have to assume that the person was unconscious or unaware of what was going on . . . ." Moreover, he added that

"emotional excitement might [have caused Ms. Bernson] to see things differently than some other observer would." Thus, it is clear that the defendant was able to elicit the kind of testimony he now claims he was prevented from obtaining. The rulings of the trial court were not in error.

In view of the foregoing, we hold that the issues raised on appeal are without merit and accordingly affirm the defendant's conviction.

WILKINS and HALL, JJ., concur.

CROCKETT, C. J., and MAUGHAN, J., concur in the result.