STATE of Utah, Plaintiff and Appellee,

v.

Terry L. HAY, Defendant and Appellant.

No. 900457.

Supreme Court of Utah.

Sept. 3, 1993.

2

R. Paul Van Dam, Atty. Gen., Marian Decker, Asst. Atty. Gen., Salt Lake City, for plaintiff and appellee.

Manny C. Garcia, Salt Lake City, for defendant and appellant.

HALL, Chief Justice:

Defendant Terry L. Hay appeals from a conviction of criminal homicide, murder in the second degree, a first degree felony in violation of Utah Code Ann. § 76-5-203. We affirm.

On July 27, 1989, Hay and Lony Crosby went to Wales, Utah, to work and stay with Crosby's grandparents. On the afternoon of August 1, 1989, Hay and Crosby packed and went up into the mountains to hunt and camp. Later that afternoon, Crosby's grandfather heard two gunshots fired in rapid succession coming from the nearby mountains. Approximately one hour later, Hay returned alone to the Crosbys' home. Crosby's grandmother asked Hay where Crosby was, and he responded that Crosby was still up in the mountains preparing their dinner. Hay then collected his belongings and left, indicating that he was returning to the mountains to meet Crosby. Crosby's grandparents saw neither Crosby nor Hay again.

Hay returned to Salt Lake City, where on the night of August 1, 1989, he met with Crosby's girlfriend, Jennifer Bratt. When Bratt asked Hay about Crosby's whereabouts, Hay told her that while in the mountains, Crosby had hit him over the head with a rock, taken the guns and knives they had with them, and left. Hay speculated that Crosby had gone to Reno, Nevada, to see an ex-girlfriend. At trial, Bratt stated that while Hay appeared dirty at the time, she saw no sign of injury.

On August 2, 1989, Hay again spoke with Bratt. He indicated that he had spoken with Crosby and that Crosby had in fact hitchhiked to Reno. On that same day, Hay spoke with a friend, Travis Pearce, who inquired as to Crosby's whereabouts. Hay told Pearce that he had been camping with Crosby and that while he was sleeping, Crosby stole $30 and a .22 rifle from him and that when he awoke, Crosby was gone. Hay also told Pearce that he thought Crosby was on his way to Wisconsin.

Hay spoke with Crosby's mother, Lois Crosby, on August 2, 1989. Hay told Mrs. Crosby that while camping, Crosby began talking about hitchhiking to Wisconsin. Later that afternoon, Hay told Mrs. Crosby that Crosby had been seen the night before saying goodbye to some people. That evening, Hay again spoke with Mrs. Crosby. He told her that while camping, he took a

nap and when he awoke, Crosby was gone. Hay also indicated that he and Crosby had a fight. Later in the evening of August 2, 1989, at Crosby's father's request, Salt Lake County Deputy Sheriff Paul Relch met with Hay. Hay repeated his story that he had taken a nap and when he awoke, Crosby was gone. When Relch indicated that Hay's story did not make sense, Hay became emotional and said that he had promised that he would not reveal Crosby's whereabouts but that Crosby had run away to Reno to get a job. Hay also told Relch that he and Crosby had stolen a truck in Wales to return to Salt Lake City.

On approximately August 4, 1989, Crosby's family filed a missing person report. Over the next several months, Hay continued to represent to others that he had been in contact with Crosby. Sometime after Crosby's disappearance, Hay and Bratt began to date seriously. Certain evidence revealed that Hay had a romantic interest in Bratt before Crosby's disappearance and that Hay had indicated to Bratt that he wished she would not date Crosby.

On December 31, 1989, two hunters found a decomposed body, later identified as Crosby's, near Utah Lake. An autopsy revealed that Crosby had been shot twice in the back of the head, probably while lying face down. The autopsy also uncovered a fracture above the eyebrow area that appeared to be the result of a severe blow to the head with a blunt object. The medical examiner concluded that Crosby's death was a homicide caused by two gunshots to the head.

Once Crosby's body had been discovered and identified, Hay was brought in for questioning. When inconsistencies in his story were called into question, Hay confessed that he was responsible for Crosby's death. He first claimed that upon returning from Wales, he and Crosby decided to camp in a field near the home of Crosby's parents in Murray, Utah. Hay further related that they got into an argument over Bratt and that when Crosby came at him with a knife, he grabbed his rifle and pointed it at Crosby and it discharged. Hay said that he was not exactly sure how the shoot-ing occurred or where Crosby had been shot, but he admitted taking Crosby's body and dumping it near Utah Lake.

When questioned by Murray City Detective Jeff Anderson, Hay provided much the same story, maintaining that the shooting took place in Murray. He added that they had been drinking while camping in the field and that when they began talking about Bratt, Crosby became upset, grabbed his knife, and said to Hay, "I'm gonna kill you." Hay said that when Crosby came at him with the knife, he grabbed the .22 rifle to scare Crosby. Crosby swung the knife at Hay, which caused Crosby to spin around and stumble. Hay said that the rifle then discharged accidentally because his fingers were shaking. He guessed that the rifle was fired two or three times and remembered Crosby's body falling motionless to the ground. Hay claimed that he was frightened and wanted to hide Crosby's body and run away. He told Detective Anderson that after dumping Crosby's body near Utah Lake, he returned to Murray and threw Crosby's other belongings, including the knife with which Crosby allegedly threatened Hay, in a nearby creek. Hay described the knife as having a long blade and a black and red handle.

Notwithstanding Hay's varied versions of the shooting incident, there was evidence that the homicide took place in Wales. The investigation in Wales uncovered the spot where it was believed Crosby and Hay camped and a cowboy boot similar to the one found with Crosby's body. Two .22 casings, a knife, and a shallow hole covered with broken branches were found nearby.

Hay was charged with the murder, and at trial, for the first time, he confessed that the shooting actually took place in Wales while he and Crosby were in the mountains. Hay testified that the two had taken knives and his .22 rifle with them into the mountains to hunt rabbits. Consistent with his earlier contentions, Hay testified that the two were discussing Bratt when Crosby grabbed a knife and came at him, threatening to kill him. Hay further testified that he picked up his rifle to scare

Crosby and make him back off. When Crosby swung the knife at Hay, he spun and began to fall and the gun went off. At trial, Hay claimed that the gun discharged only once. He testified that he did not know what to do but called to Crosby while he was lying on the ground and Crosby did not move. Hay left Crosby's body on a sleeping bag in the pit Crosby had dug to cook their dinner and covered him with dirt. He stated that he "didn't want to see [Crosby's body]" and that he did not know where Crosby had been shot or see the wounds or blood in the back of Crosby's head.

Hay said he threw the black-and-red-handled knife near the campsite and gathered up the rest of their belongings. He remembered leaving the mountains and stealing a truck that he drove to Salt Lake City. Hay claimed that he had fabricated the earlier stories and had lied to Crosby's family and friends because he wanted to believe that Crosby was not dead and that he was just out of town. Hay testified that he returned to the campsite approximately six weeks later, partly to convince himself that the shooting had not occurred. He remembered picking up the sleeping bag and Crosby's body but not looking at it. Hay then drove to the spot near Utah Lake where he left the body. Throughout the proceedings, Hay maintained that he had acted in self-defense when Crosby came at him with a knife.

Prior to trial, Hay moved to exclude evidence concerning the transportation of Crosby's body, arguing that it was not relevant to the issue of guilt and that its probative value was outweighed by the potential for unfair prejudice and confusing the jury. The trial court denied the motion, indicating that the evidence had limited relevance but also stating that the State would not be permitted to introduce the gruesome aspects of moving the body.

At trial, over the defense's objections, the prosecution introduced an old knife with a black taped handle found near the campsite. The defense objected on the basis that the knife did not match the description of the knife Hay claimed Crosby used to attack him. After the case was submitted to the jury, defense counsel noticed a knife with a black and red handle in the prosecutor's briefcase. Defense counsel moved for a mistrial on the grounds that (1) she was ineffective in failing to discover the existence of the knife in order to use it as an integral part of Hay's defense and for proceeding under the assumption that the knife had not been found, and (2) the prosecution did not disclose the existence of the knife that would have served to corroborate Hay's testimony and instead introduced an unrelated knife, which amounted to prosecutorial misconduct. The trial court denied the motion but added that corrective measures would be taken to remove any prejudice. Defense counsel renewed the motion for mistrial, which was again denied. The trial court submitted the black-and-red-handled knife to the jury with a statement from each party regarding its importance. Following deliberation, the jury convicted Hay as charged. He was sentenced to a prison term of five years to life with an additional firearm enhancement term of one year, to run concurrently.

Hay appeals his conviction, arguing that the trial court should have granted a mistrial due to ineffectiveness of counsel and prosecutorial misconduct. In addition, Hay argues on appeal that he was deprived of effective assistance of counsel when counsel failed to object to questions and testimony regarding the "gruesome details" of transporting Crosby's body, since the court had indicated prior to trial that such details would not be admissible.

Hay argues first that a mistrial should have been granted due to ineffective assistance of counsel. A claim of ineffectiveness presents a mixed question of law and fact.[1] Therefore, when a trial court has heard a motion based on ineffectiveness of counsel, we afford the trial court's conclusions no deference but review

---

1. *State v. Templin*, 805 P.2d 182, 186 (Utah 1990) (citing *Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984)).

them for correctness.[2] The trial court's factual findings, however, will be set aside only if they are clearly erroneous.[3]

■ To prevail on a claim of ineffective assistance of counsel, a defendant must meet the two-part test set forth by the United States Supreme Court in *Strickland v. Washington:*[4] "First, the defendant must show that counsel's performance was deficient.... Second, the defendant must show that [counsel's] deficient performance prejudiced the defense."[5] The defendant meets the first part of the *Strickland* test by showing " 'that counsel's representation fell below an objective standard of reasonableness.' "[6] In meeting the burden of the second part of the test, the defendant " 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' "[7]

Hay contends that his trial counsel's performance was deficient when counsel failed to discover the existence of the knife and proceeded under the assumption that the knife had not been found and was therefore not available.[8] Hay argues that the knife was a critical piece of evidence that would have been an integral part of his defense, serving to corroborate his claim of self-defense and enhance his credibility. He further argues that counsel's failure to discover the existence of the knife resulted in prejudice because it altered and weakened counsel's presentation of his defense.

■ We begin our analysis by addressing the second prong of the *Strickland* test. *Strickland* stated that when reviewing an ineffectiveness claim, it is not necessary to determine whether counsel's performance was deficient before judging whether prejudice resulted from the alleged deficiencies. Rather, if it is easier to dispose of the claim due to lack of sufficient prejudice, then that course should be followed.[9]

■ A review of the record leads to the conclusion that absent counsel's alleged errors, it is not likely that the outcome at trial would have been more favorable to Hay. The reasons for this conclusion are as follows: First, the theory of self-defense was squarely presented to the jury. In addition to Hay's testimony in which he maintained that he shot Crosby in self-defense, defense counsel presented testimony that would serve to support Hay's story. Counsel introduced testimony of a pathologist who suggested that because the entrance wounds on Crosby's skull were not parallel, they were not consistent with entrance wounds resulting from an execution-type killing and that the entrance wounds in Crosby's skull could have resulted if Crosby was falling and turned his head away from the gun. In addition, the medical examiner who performed the autopsy on Crosby, when cross-examined by defense counsel, could not say with "absolute certainty" that Crosby's head was stationary when he was shot. Furthermore, in support of Hay's claim of self-defense, defense counsel established on the cross-examination of Bratt that Crosby was jealous of her relationship with Hay and that he had told her he would kill Hay someday.

Finally and most important, for purposes of determining whether Hay was prejudiced by counsel's allegedly deficient per-

2. *See id.*

3. *Id.*

4. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

5. *Id.* at 687, 104 S.Ct. at 2064.

6. *Templin,* 805 P.2d at 186 (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065).

7. *Id.* at 187 (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068).

8. When Hay's trial counsel discovered the knife in the prosecutor's briefcase, the prosecution claimed that the knife had been referred to in the police reports. Thus, operating on the assumption that she had been apprised of the knife's existence through discovery and that she had failed to realize its availability, Hay's trial counsel moved for a mistrial on the ground that she had been ineffective.

9. *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069; *see, e.g., Fernandez v. Cook,* 217 Utah Adv.Rep. 3, 6 (July 12, 1993); *State v. Verde,* 770 P.2d 116, 119 (Utah 1989); *State v. Speer,* 750 P.2d 186, 191–92 (Utah 1988).

formance, the trial court sought to rectify any prejudice that might have occurred due to counsel's failure to discover the knife's existence by admitting it into evidence and allowing the jury to consider it. The knife was admitted into evidence along with a map of the area of the campsite where the shooting took place. The trial judge explained to the jury that the parties had stipulated to admitting the knife into evidence and that the knife had been found in late August or early September 1989 at a place designated on the map. In addition, the jury was presented with a statement from each party concerning the knife's significance. In its statement, the defense asserted that the knife matched Hay's description of the knife Crosby used, the knife was recovered south of the campsite where the shooting took place, and Hay testified that he threw the knife to the south of the campsite.

Hay contends that despite the fact that the knife was ultimately admitted into evidence, his defense had already been prejudiced and the trial court's attempt to "cure" the situation was pointless. He asserts that the late entry of the knife into evidence served only to confuse the jury in light of the fact that the jury was under the assumption that the knife had not been found and that the defense's statement to the jury concerning the knife's evidentiary value was insufficient to emphasize the knife's importance. We disagree. Any prejudice sufficient to undermine confidence in the outcome that might have resulted from counsel's failure to discover the knife before trial could have resulted only if the jury had never received the knife and had been allowed to continue deliberations. Instead, the jury's deliberation was interrupted, and the jury was suddenly provided with a piece of evidence that was described by Hay but presumably had not been found or, possibly, in the minds of the jurors, did not exist at all. If anything, the fact that the knife was admitted in such a dramatic fashion rather than during trial under normal circumstances focused more attention on the knife and probably aided Hay's defense.

We conclude that while counsel may have performed deficiently when she did not realize the existence of the knife during discovery, in light of the above discussion, such deficient performance did not prejudice the trial result. Accordingly, we hold that trial counsel did not render ineffective assistance of counsel, and therefore, it was proper for the trial court to deny Hay's motion for mistrial.

Hay alternatively argues that a mistrial should have been granted due to prosecutorial misconduct.[10] Specifically, Hay contends that the prosecution deliberately concealed and withheld the knife he described and then introduced another knife. Hay asserts that the knife the prosecution withheld was material to his defense, that if introduced during trial, it might have had an exculpatory impact, and that introduction of the other knife had the effect of misleading the jury. Hay argues that the prosecution's misconduct constituted a denial of due process.

■ On appeal from a denial of a motion for mistrial based on prosecutorial misconduct, because the trial court is in the best position to determine an alleged error's impact on the proceedings, we will not reverse the trial court's ruling absent an abuse of discretion.[11]

At trial, the prosecution stated that the "knife [was] referred to in at least one or two of the police reports." The prosecution further explained that the knife had

**10.** The State asserts that Hay's claim of prosecutorial misconduct was not properly preserved for review. The State argues that Hay did not object specifically on the ground of prosecutorial misconduct and we therefore should decline to consider his claim on appeal. *See State v. Cobb,* 774 P.2d 1123, 1126 (Utah 1989). A review of the record reveals that Hay moved for a mistrial precisely on the ground of prosecutorial misconduct. Hay's motion was therefore sufficient to preserve the claim for our review. *See State v. Cummins,* 839 P.2d 848, 852 (Utah Ct.App.1992) (citing *State v. Gardner,* 789 P.2d 273, 287 (Utah 1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 965 (1990)).

**11.** *State v. Gardner,* 789 P.2d 273, 287 (Utah 1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 965 (1990); *Speer,* 750 P.2d at 190.

been found during a search of the campsite area and was later given to the Sanpete County Sheriff's Department. The prosecution asserted that without the person who found the knife, it could not lay a proper foundation as to where the knife was found and therefore could not have admitted it into evidence.

■ Despite these contentions, we think that the prosecution acted improperly when it did not offer the knife directly to the defense, knowing that it could possibly be the knife Hay described. It is important to emphasize that the prosecution has a duty to provide discovery materials to the defense on request.[12] This duty extends to unrequested information that is or may be exculpatory.[13] Rule 3.8(d) of the Rules of Professional Conduct requires a prosecutor to "[m]ake timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense." Indeed, it is a violation of due process not to do so, whether or not the defense requests that information.[14]

■ Even assuming that the prosecutor was laboring under the assumption that defense counsel knew through the police reports that the knife had been found, he should have disclosed to defense counsel that he had the knife once he saw that defense counsel believed the knife had not been found and that the knife could possibly corroborate defendant's story. It is no excuse for the prosecutor to say that he could not lay the proper foundation. If defense counsel had known that the knife had been found, she could have stipulated to its admission. There is no legitimate reason for the prosecutor to fail to divulge

that he had this piece of evidence in his possession.

■ In short, the prosecution's responsibility is that of "a minister of justice and not simply that of an advocate,"[15] which includes a duty "to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence."[16] A criminal trial is more than a contest between the prosecution and the defense; it is a search for the truth.[17]

■ Having concluded that the prosecution violated its duty of disclosure, it is necessary to determine the ultimate effect of the prosecution's misconduct. We will reverse on the basis of prosecutorial misconduct only if " 'the error is substantial and prejudicial such that there is a reasonable likelihood that in its absence, there would have been a more favorable result for the defendant.' "[18] For purposes of determining whether a mistrial should have been granted, our overriding concern is that Hay received a fair trial.

We conclude that the prosecution's misconduct was not prejudicial. This case presents a somewhat unique situation because the very evidence that Hay claims was concealed by the prosecution was discovered before the jury rendered a verdict. Thus, the disposition of this issue also turns on the fact that the trial court admitted the knife into evidence for the jury's consideration despite its late discovery. Again, the jury received the knife together with a statement from the defense illuminating the knife's importance and was then allowed to consider fully its evidentiary value. Thus, any exculpatory value the knife might have had was not lost, and any substantial prejudice that might have occurred due to the prosecution's misconduct

---

12. Utah R.Crim.P. 16(a); *State v. Archuleta*, 850 P.2d 1232, 1242–43 (Utah 1993).

13. *State v. Worthen*, 765 P.2d 839, 849 (Utah 1988) (citing *State v. Carter*, 707 P.2d 656, 662 (Utah 1985)).

14. *Id.; see also Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963); *Carter*, 707 P.2d at 662; *State v. Jarrell*, 608 P.2d 218, 224 (Utah 1980).

15. Rules of Professional Conduct Rule 3.8 cmt.

16. *Id.*

17. *Carter*, 707 P.2d at 662; *Jarrell*, 608 P.2d at 224.

18. *Gardner*, 789 P.2d at 287 (quoting *State v. Tillman*, 750 P.2d 546, 555 (Utah 1987)); *see also Speer*, 750 P.2d at 190.

was eliminated. We therefore hold that it was not an abuse of discretion for the trial court to deny Hay's motion for mistrial on the basis of prosecutorial misconduct.

■ Hay's final argument on appeal is that he was denied effective assistance of counsel when counsel failed to object at trial when the prosecution presented "gruesome details" surrounding Hay's transporting Crosby's body from the campsite where the shooting occurred to Utah Lake, where the body was discovered.[19] Again, to reverse a conviction on the basis of ineffective assistance of counsel, Hay must show that counsel's acts or omissions fell below an objective standard of reasonable professional assistance[20] and that a reasonable probability exists that absent counsel's errors, the result would have been different.[21]

In support of his argument, Hay points to the pretrial hearing, where he sought to exclude evidence regarding the transporting of Crosby's body. The trial judge, after ruling that the evidence was relevant and that its probative value was not substantially outweighed by the danger of unfair prejudice, stated, "If we were to get into the issue of some gruesome aspects of the movement of the body, my ruling would be otherwise." Hay argues that counsel's performance was deficient because, first, counsel did not object to the prosecution's questions concerning gruesome details of the movement of Crosby's body,[22] especially after the trial judge's

previous indication that evidence of that nature would not be allowed, and second, counsel had stipulated to facts regarding the same.[23] Hay argues that counsel's deficient performance prejudiced his defense because the evidence was inflammatory, thus, allowing the jury to base its decision on something other than the facts.

Again, in addressing this claim, it is not necessary to determine whether Hay has met the first prong of the test.[24] While counsel's failure to object to gruesome details involved in moving Crosby's body may have constituted deficient performance, Hay "has not shown that absent [counsel's] error, there is a reasonable probability of a more favorable result."[25] A review of the record reveals substantial evidence to support the jury's verdict. Furthermore, Hay's claim of self-defense became a question of credibility, one which the jury resolved against him. Accordingly, it is not likely that the outcome at trial would have been different even if counsel had objected at trial to the gruesome details elicited by the prosecution. Therefore, prejudice has not been shown.

We affirm the judgment and sentence of the trial court.

HOWE, Associate C.J., and STEWART, DURHAM and ZIMMERMAN, JJ., concur.

---

19. This claim is being raised for the first time on appeal. Ordinarily, a claim of ineffectiveness of counsel should be raised in a postconviction proceeding. *State v. Humphries*, 818 P.2d 1027, 1029 (Utah 1991). However, when the trial record is adequate to permit a decision of the issue, we will review the claim. *Id.*

20. *Templin*, 805 P.2d at 186 (citing *Strickland*, 466 U.S. at 688–89, 104 S.Ct. 2052).

21. *Id.* at 187 (citing *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068).

22. During the cross-examination of which Hay complains, the prosecution brought out that Hay picked up and carried a body that had been decomposing for a month and a half, that it was a "terrible sight" and a had "terrible smell," and that the body was in awful condition, to a point

where it would be falling apart at the various limbs. At this time, the prosecution also pursued a series of questions concerning the fact that Crosby's foot had separated from his body. The prosecution suggested that after the foot broke off, Hay cut open the boot, removed the foot, and discarded the boot.

23. The prosecutor read the following statement: "It's stipulated that when the remains of Lony Crosby were located … his sock was found located on top of his torso near the shoulders. Inside that sock were the remains of his right foot."

24. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069; *see, e.g., Gardner*, 789 P.2d at 288; *Verde*, 770 P.2d at 118–19.

25. *Verde*, 770 P.2d at 119.