*2006 UT 43*

**STATE of Utah, Plaintiff, Appellant,
and Cross–Appellee,**

**v.**

**Sean GRAHAM, Defendant, Appellee,
and Cross–Appellant.**

Nos. 20050046, 20050051.

Supreme Court of Utah.

Aug. 8, 2006.

Mark L. Shurtleff, Att'y Gen., Laura B. Dupaix, Asst. Att'y Gen., Salt Lake City, Scott Garrett, Cedar City, for plaintiff.

Douglas D. Terry, St. George, Duncan M. James, David M. Kindopp, Ukiah, CA, for defendant.

WILKINS, Associate Chief Justice:

¶ 1 Defendant Sean Graham is a seventeen-year-old who, together with another boy, beat his group home counselor twice over the head with a baseball bat and stuffed him in a locked closet. The State charged Graham with, among other crimes, aggravated murder and kidnapping, but the district court refused to bind Graham over on those two charges. The case is now before us on interlocutory appeal. We granted review of the following six issues, three on direct appeal and three on cross-appeal:

(1) Whether the State presented sufficient evidence of the Defendant's mental state at the preliminary hearing stage to support a charge of aggravated murder;

(2) Whether the State demonstrated a kidnapping as an aggravating factor pursuant to Utah Code section 76–5–202(1)(d);

(3) Whether the State demonstrated that the homicide was accomplished in the course of committing the kidnapping as a predicate offense pursuant to Utah Code section 76–5–203(2)(d);

(4) Whether the Defendant kidnapped the victim within the meaning of Utah Code section 76–5–301;

(5) Whether facilitation of the Defendant's departure from a group home may be construed as "other personal gain" within the meaning of Utah Code section 76–5–202(1)(f); and

(6) Whether Utah Code section 76–5–202(1)(f) is unconstitutionally vague or overbroad.

¶ 2 We affirm the district court's determination at the preliminary hearing that Graham kidnapped Arnett within the meaning of Utah Code section 76–5–301. We reverse, however, the court's conclusions regarding the insufficiency of evidence for the aggravated murder mens rea, for kidnapping as an aggravating factor, and for kidnapping as a predicate offense. We also note that the issues involving Utah Code section 76–5–202(1)(f) are moot because the State has dropped its "other personal gain" argument.

## BACKGROUND

### I. FACTUAL BACKGROUND

¶ 3 Maximum Life Skills Academy (the Academy) is a behavior modification facility for troubled teenage boys whose parents voluntarily place them in the Academy and assign legal guardianship to the facility. Graham was scheduled to leave the Academy on March 4, 2004, but one week before his scheduled departure, staff members discovered that he and his friend Jesse Simmons had cheated on many of their twelfth-grade English assignments. The Academy's director required Graham and Simmons to make up those assignments, which ultimately led to a postponement of their release date. Graham and Simmons subsequently exhibited poor behavior because of their anger about the postponement. The Academy's staff reprimanded Graham and Simmons for the poor behavior by placing all six boys attending the

Academy on "lock-down," a revocation of all privileges.

¶ 4 As testified by one of the other four boys at the Academy, either the night before or the morning of the murder, staff members heard Graham and Simmons "talkin' about running." To help prevent escape, the staff asked Graham, Simmons, and two other boys to sleep on their mattresses in the front room where the night counselor could watch them closely.

¶ 5 On March 8, 2004, night counselor Anson Arnett arrived at the Academy around 9 p.m. He was the only counselor on duty that night. After telling the four boys upstairs to be quiet and to go to bed, Arnett went downstairs to enable the alarm and to check on the two boys sleeping there. Graham and Simmons had been whispering to one another, and as soon as Arnett went downstairs, they got out of bed. Simmons pulled an aluminum baseball bat out of his sheets, and he and Graham crouched at the top of the stairs where Arnett could not see them.

¶ 6 Only Graham could see Arnett ascend the staircase. Simmons could not. As soon as Graham saw Arnett's head, he glanced over to Simmons—when their eyes met, Simmons stood up and hit Arnett on the back of the head with the aluminum bat. Banging his head against the wall, Arnett fell.

¶ 7 Arnett was not knocked unconscious from this blow. In fact, Arnett stood up while Graham and Simmons asked, "What happened? Are you alright?" The two boys told Arnett that he had fallen. Arnett walked into his office and shut the door, at which point Graham asked Simmons, "Why didn't you knock him out the first time?"

¶ 8 When Arnett reappeared a few minutes later, he walked down the stairs and out the front door. Graham and Simmons, again, crouched in the same position at the top of the stairs and waited for Arnett to appear. Arnett reentered the house and moved up the stairs. Graham glanced at Simmons. Once their eyes met, Simmons hit Arnett a second time on the back of the head with the

bat. This time when Arnett fell, he started convulsing. Graham frisked Arnett for his keys to the Academy and its van and then stuffed him into a closet, with his head on the floor and his legs in the air over a filing cabinet. Graham and Simmons locked the door with a deadbolt that could only be opened with a key. There was no doorknob.

¶ 9 Graham and Simmons collected their belongings and fled in the Academy's van. The four boys remaining in the house tried to call for help, but Graham and Simmons had cut the phone lines. Consequently, two of the boys ran over two miles to a counselor's home for help. The counselor drove back to the Academy with the boys and helped Arnett until the ambulance and police arrived.

¶ 10 Arnett died the following night from blunt force trauma to the head.

## II. PROCEDURAL BACKGROUND

¶ 11 The State charged Graham with aggravated murder, kidnapping, theft of an operable motor vehicle, and theft. The State also charged Graham with four statutory aggravators for the murder count: (1) the homicide was committed while the actor was engaged in the commission of kidnapping;[1] (2) the homicide was committed for the purpose of effecting Graham's or another's escape from lawful custody;[2] (3) the homicide was committed for a pecuniary gain;[3] and (4) the homicide was committed in an especially heinous, atrocious, cruel, or exceptionally depraved manner.[4]

¶ 12 After a preliminary hearing, the magistrate bound Graham over on all counts but on only two of the statutory aggravators to murder: (1) the homicide was committed while the actor was engaged in the commission of a kidnapping, and (2) the homicide was committed for pecuniary or other personal gain.

¶ 13 Graham moved to quash the bindover order, and the district court found that the evidence did not support a reasonable belief

---

1. Utah Code Ann. § 76–5–202(1)(d) (2005).

2. *Id.* § 76–5–202(1)(f).

3. *Id.* § 76–5–202(1)(g).

4. *Id.* § 76–5–202(1)(r).

that Graham "had the specific intent to cause the death" of the victim. The district judge also found that the homicide did not occur while Graham "was engaged in the commission of . . . [a] kidnapping or aggravated kidnapping."

¶ 14 Absent the requisite intent to kill Arnett, the State was required to reduce Graham's aggravated murder charge to simple murder. The trial court denied the prosecution's request to proceed on the theory of felony murder, concluding that the homicide did not occur during the commission of a kidnapping.

¶ 15 This case is now before us on interlocutory appeal.

## ANALYSIS

¶ 16 This court has jurisdiction over "interlocutory appeals from any court of record involving a charge of a first degree or capital felony."[5] Because the six issues before us are inquiries of proper statutory interpretation, they are matters of law, which we review for correctness.[6] Accordingly, we afford no deference to the determinations of lower courts.[7]

¶ 17 As we set forth the correct statutory interpretations for each of these issues before us and apply the given facts to make our final determinations of law, we must employ the bindover standard implemented in preliminary hearings. "To bind a defendant over for trial, the State must show 'probable cause' at a preliminary hearing by 'present[ing] sufficient evidence to establish that the crime charged has been committed and that the defendant committed it.'"[8] In other words, "to prevail at a preliminary hearing, the prosecution must . . . produce

believable evidence of all the elements of the crime."[9] It is not necessary to actually prove the elements of the crime at a preliminary hearing. Instead, to obtain a bindover for trial, which is the stage at which this case reached appeal, the prosecution must produce sufficient evidence to reasonably conclude that the requisite elements were satisfied and that the defendant committed the crime.[10]

## I. THE STATE PRESENTED SUFFICIENT EVIDENCE OF GRAHAM'S MENTAL STATE TO SUPPORT A CHARGE OF AGGRAVATED MURDER

¶ 18 The State argues that the trial court erroneously required specific intent under the aggravated murder statute. The State also asserts that it presented sufficient evidence of Graham's mental state to support a charge of aggravated murder. Graham contends, however, that the trial court properly required specific intent—an intentional *and* knowing mental state—for aggravated murder and that the State failed to preserve an argument against the application of this mens rea by conceding that the law requires an intentional and knowing mental state. Moreover, Graham alleges that under a specific intent analysis, the State provided insufficient evidence to support the aggravated murder charge.

¶ 19 We first address the adequacy of the State's preservation of the trial court's application of specific intent. We then discuss the correct mental state for aggravated murder. Lastly, we turn to the sufficiency of the evidence to satisfy the requisite mens rea.

---

5. Utah Code Ann. § 78-2-2(3)(h) (2005).

6. *See Jedrziewski v. Smith*, 2005 UT 85, ¶ 4, 128 P.3d 1146 ("The district court's decision was a matter of law, so we review for correctness.").

7. The recently-adopted standard of review found in *State v. Virgin*, 2006 UT 29, 137 P.3d 787, which requires "some deference" to a magistrate's determinations from the preliminary hearing, does not apply in this case because the six issues before us are matters of statutory interpretation and are thus strict questions of law re-

viewed for correctness and afforded no deference. The *Virgin* standard of review requiring "some deference" is limited to mixed questions of law and fact. *Id.* ¶ 26.

8. *State v. Clark*, 2001 UT 9, ¶ 10, 20 P.3d 300 (quoting *State v. Pledger*, 896 P.2d 1226, 1229 (Utah 1995)).

9. *Id.* ¶ 15.

10. *See Virgin*, 2006 UT 29, ¶ 17, 137 P.3d 787.

¶ 20 In Utah, to charge one with aggravated murder, the State must demonstrate probable cause that an actor "intentionally *or* knowingly causes the death of another under any of the following circumstances" listed in Utah Code section 76–5–202(1) (emphasis added). Under Utah statute, a person acts intentionally "when it is his conscious objective or desire to engage in the conduct or cause the result." [11] On the other hand, a person acts knowingly "when he is aware of the nature of his conduct or the existing circumstances" and is "aware that his conduct is reasonably certain to cause the result." [12] Thus, "it is certainly possible that a knowing crime can be committed unintentionally." [13] "That is, a person can know that a certain action will cause a certain result without that result being the person's conscious objective." [14]

¶ 21 The State never conceded a required mens rea of only specific intent. In fact, our research led to ample discourse in the hearing transcripts that indicates that the State focused its analysis on "intentionally" *or* "knowingly," and discounted any requirement of both in order to satisfy the necessary mental state for aggravated murder. In arguing that the State conceded this point, Graham's briefs appear to misrepresent the dialogue between the prosecution and the trial judge at the preliminary hearing. Rather, when the judge repeatedly stated that "an essential element to capital homicide is an intent to kill," the State answered with "Yes. Intentional *or* knowing, yes." (emphasis added). The judge then followed up with "there has to be an intent to kill, not just [ ] an intent to engage in the conduct but an intent to cause death. Does the State agree with that's [sic] an element of capital homicide?" And the State answered with "Yes, Your Honor. We agree that it has to be intentional or knowingly, yes." We do not interpret the prosecution's responses as a concession that a defendant must act with specific intent—an intentional mental state—to satisfy the requisite mens rea for aggravated murder.

¶ 22 We believe instead, after careful review of the record, that the prosecution intended to present evidence that if Graham did not act "intentionally," he at a minimum acted "knowingly," and that under our statutory language, either mens rea sufficed to bind Graham over on an aggravated murder charge. Even in those few places in the record where the prosecution uses the phrase "intentionally and knowingly," when read in the context of the surrounding statements, it is clear that the State asserts that both mental states are means by which one may be charged with aggravated murder. Accordingly, we disagree with Graham. The State is not precluded from contesting the trial court's conclusions as to the requisite mens rea. The State argued "intentionally or knowingly" at the preliminary hearing and may therefore challenge the trial court's insistence on specific intent.

¶ 23 Next, we turn to the substance of Graham's argument that despite explicit statutory language, our case law requires the defendant to have acted "intentionally" *and* "knowingly" for the State to charge him with aggravated murder. We disagree. Our case law clearly affirms the language of Utah Code section 76–5–202(1) which expressly provides that "criminal homicide constitutes aggravated murder if the actor *intentionally or knowingly* causes the death of another under *any* of the following circumstances." [15] The statute lists several circumstances, one of which is kidnapping, which elevate criminal homicide to murder.

¶ 24 Twenty years ago, we addressed this exact question in *State v. Shaffer,* concluding that the argument that first degree murder requires an intentional *and* knowing mental state is "entirely without merit." [16] Instead, "[t]he requisite mental state for first degree

---

11. Utah Code Ann. § 76–2–103(1) (2005).

12. *Id.* § 76–2–103(2).

13. *State v. Casey,* 2003 UT 55, ¶ 37, 82 P.3d 1106.

14. *Id.*

15. Utah Code Ann. § 76–5–202(1) (emphasis added).

16. *State v. Shaffer,* 725 P.2d 1301, 1314 (Utah 1986).

murder is 'intentionally *or* knowingly.' " [17] The mental state for aggravated murder, Utah's present equivalent to first degree murder,[18] is specified as "intentionally *or* knowingly," and any case law suggesting to the contrary should be disregarded.

¶ 25 Lastly, we conclude that the prosecution met the bindover standard for aggravated murder because it presented sufficient evidence to reasonably conclude that Graham intentionally or knowingly caused the death of Arnett. Graham crouched at the top of the staircase, knowing that his friend Simmons was holding, with the intent to strike Arnett, an aluminum baseball bat. When Arnett ascended the staircase, Graham met eyes with Simmons, alerting Simmons to the appropriate time to strike Arnett. After Arnett had been hit and was still conscious and mobile, Graham asked Simmons why he "didn't knock him [Arnett] out the first time." Through this statement, Graham indirectly encouraged Simmons to strike Arnett a second time, which Simmons did, knocking Arnett to the ground and into convulsions. Graham assisted in shoving Arnett into a closet, locked it with a deadbolt to which only he and Simmons had the key, and fled the scene of the crime. Finally, Graham had cut the phone lines at the home, making it impossible for the remaining four boys to call for help. Therefore, at the bindover stage, it was reasonable to conclude that Graham understood that this postponement of medical assistance to Arnett, particularly after such a violent beating, could lead with reasonable certainty to Arnett's death.

¶ 26 For the above reasons, it is reasonable to conclude that Graham acted either intentionally or knowingly in causing Arnett's death. The prosecution presented sufficient evidence of an "intentional or knowing" mental state as required by Utah Code section 76-5-202(1). Thus, the trial court erroneously required specific intent.

## II. THE STATE DEMONSTRATED KIDNAPPING AS AN AGGRAVATING FACTOR PURSUANT TO UTAH CODE SECTION 76-5-202

¶ 27 In Utah, criminal homicide constitutes aggravated murder "if the actor intentionally or knowingly causes the death of another . . . [when] the homicide was committed while the actor was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit . . . aggravated kidnapping [or] kidnapping." [19] Thus, to demonstrate that Graham's kidnapping of Arnett constituted a valid factor for aggravated murder, the State must show that (1) Graham satisfied the requisite mental state for aggravated murder, (2) his actions constituted kidnapping under Utah Code section 76-5-301, and (3) the homicide occurred "while" Graham was engaged in the kidnapping pursuant to section 76-5-202(1)(d). We have addressed the requisite mental state and have concluded that the State met its burden for a bindover. Therefore, we turn to whether Graham's actions constituted kidnapping under Utah Code section 76-5-201, and if so, whether the homicide occurred "while" Graham was engaged in the commission of the kidnapping.

### A. Graham's Actions Constituted Kidnapping Under Utah Code Section 76-5-301

¶ 28 Utah Code section 76-5-301 provides that

(1) [a]n actor commits kidnapping if the actor intentionally or knowingly, without authority of law, and against the will of the victim: (a) detains or restrains the victim for any substantial period of time; (b) detains or restrains the victim in circumstances exposing the victim to risk of bodily injury; [or] (c) holds the victim in involuntary servitude. . . .

To demonstrate sufficient evidence of kidnapping in this case, the State must show that one could reasonably conclude that Graham,

---

17. *Id.* (emphasis added).

18. *See State v. Holland,* 921 P.2d 430, 437 (Utah 1996) ("'[P]leading guilty to first degree murder (now called aggravated murder) does not raise any inference of lack of competency.'").

19. Utah Code Ann. § 76-5-202(1)(d) (2005).

against the will of Arnett, detained or restrained him for any substantial period of time or detained him in circumstances exposing him to risk of bodily injury.

¶ 29 The evidence shows that in locking Arnett in a closet and in taking the only key to that closet's deadbolt lock, Graham detained and restrained Arnett for a substantial period of time. The fact that Graham and Simmons took the deadbolt's key and cut the phone lines added considerable length to Arnett's detainment because, as previously discussed, two of the remaining boys had to run over two miles for help before another counselor freed Arnett from the closet and called the paramedics.

¶ 30 Moreover, the manner in which Graham placed Arnett in the closet arguably demonstrates a detainment in circumstances exposing Arnett to risk of bodily injury. Placing him upside down on his head, the exact location of the two violent blows, Graham may have put Arnett in even greater physical danger and risk of more extensive injury than already sustained. Each of these factors, alone, and certainly together, presents sufficient evidence to bind Graham over for kidnapping Arnett. Thus, we affirm the lower court's bindover on the charge of kidnapping.

B.  *Graham Committed the Homicide While in the Commission of the Kidnapping Pursuant to Utah Code Section 76–5–202(1)(d)*

¶ 31 The critical question is whether Graham committed this homicide *while* in the

commission of the kidnapping as required by Utah Code section 76–5–202(1)(d).[20] Reasoning that because the acts which caused the homicide—the two blows to the head—occurred before the kidnapping, the trial court quashed the statutory murder aggravator on the ground that Arnett's death "did not occur *while* [Graham] *was engaged* in the commission of, or an attempt to commit, or flight after committing or attempting to commit kidnapping or aggravated kidnapping." We respectfully disagree with the trial court's reasoning. As long as the acts that constitute kidnapping occurred at or about the same time as the blows to the head and prior to Arnett's death, as part of one continuous criminal event, the homicide occurred while Graham was engaged in the commission of the kidnapping.

¶ 32 Contrary to Graham's contention, our case law does not require a "time sequence" under which the felony has already been in progress before any of the acts resulting in homicide have been committed. Graham argues that because the first step in the homicide—arguably the first blow to the head—occurred prior to the time of the kidnapping, the homicide did not occur "while" Graham was engaged in the kidnapping. We disagree.[21]

¶ 33 Our case law focuses on "whether the death and the aggravating acts constituted a 'continuity of action over a span of time.'"[22] In *State v. Johnson*,[23] we defined "while" as "during the time that,"[24] which "clearly implies a continuity of action over a span of

20.  "(1) Criminal homicide constitutes aggravated murder if the actor intentionally or knowingly causes the death of another under any of the following circumstances ... (d) the homicide was committed *while* the actor was engaged in the commission of, or an attempt to commit ... kidnapping." Utah Code Ann. § 76–5–202(1)(d) (emphasis added).

21.  Instead, we conclude that it is only logical that a homicide is not completed until the victim dies. Homicide is defined as "intentionally, knowingly, recklessly, with criminal negligence, or acting with a mental state otherwise specified in the statute defining the offense, caus[ing] the *death* of another human being." *Id.* § 76–5–201(1)(a) (emphasis added). Even if the two blows to the head started the events which result-

ed in the homicide, the "homicide" was not complete until the victim actually died.

22.  *State v. Archuleta*, 850 P.2d 1232, 1245 (Utah 1993) (quoting *State v. Johnson*, 740 P.2d 1264, 1268 (Utah 1987)).

23.  740 P.2d 1264 (Utah 1987).

24.  *Id.* at 1268. In *State v. Johnson*, we relied on the definition of "while" given by the Indiana Supreme Court in *Stroud v. State*, 272 Ind. 12, 395 N.E.2d 770, 771 (1979). Although *Stroud* dealt specifically with Indiana's death penalty statute, we find the analysis and definitions relevant and appropriate for interpreting Utah Code section 76–5–202(1)(d).

time."[25] We also explained that "the term 'while' does not indicate ... that the killing must occur at the same instant as the [kidnapping] ..., but rather indicates that the killing must be directly associated with the [kidnapping] as part of one continuous occurrence, a situation present in the instant case."[26]

¶ 34 A few years later in *State v. Archuleta*, we affirmed the reasoning in *Johnson*, relying on the same definition of "while."[27] In *Archuleta*, the defendant argued that if any of the criminal acts inflicted on the victim were completed before the intent to commit the homicide was formed, then those offenses cannot be aggravating circumstances.[28] We disagreed and held that as long as there is "no break in the chain of events from the inception of the felony to the time of the homicide, we treat the two events as part of one continuous transaction."[29]

¶ 35 Graham relies on this statement in *Archuleta* to support his assertion that the kidnapping had to begin before the homicide in order for his acts to constitute aggravated murder. That is not correct. The law, as described in *Johnson* and *Archuleta*, is that if the felony and homicide are closely related in time and proximity, it is logical to consider them as one continuous transaction, and a defendant may be charged with each separate crime committed during that transaction so long as the requisite independent elements are satisfied.

¶ 36 In this case, Graham started the chain of events by encouraging Simmons to hit Arnett with the bat. The homicide was not complete, however, until Arnett actually died. Therefore, Graham may be charged with any independent crime committed between the first blow and Arnett's death, so long as the independent crime was part of one continuous chain of events with the beating. Here, the blows and the detainment in the closet occurred mere moments apart in the chain of events leading to Graham's escape from the

Academy. Therefore, it is reasonable to conclude that the homicide occurred while Graham engaged in the kidnapping. And because kidnapping falls under those crimes listed as aggravating factors, the State may prosecute Graham for aggravated murder.

¶ 37 Finally, Graham argues that the kidnapping could not have been committed "while" he was engaged in the commission of the homicide because the mens rea required for kidnapping conflicted with the mens rea required for homicide. This contention is without merit. Both aggravated murder and kidnapping require the same mens reas: an "intentionally or knowingly" mental state.[30] The State provided sufficient evidence both that Graham "intentionally or knowingly" murdered Arnett and that Graham "intentionally or knowingly" detained and restrained him in the closet. Graham's actions satisfied the elements of these two separate acts, coupled with their corresponding requisite mental states, and are thus sufficient to support both charges.

¶ 38 In sum, the State presented sufficient evidence to permit application of kidnapping as an aggravating factor pursuant to Utah Code section 76-5-202(1)(d). The mens reas for kidnapping and for aggravated murder are the same, and Graham's actions reasonably satisfied both crimes independent from each other. And because the homicide occurred while in the commission of the kidnapping, Graham should have been bound over for aggravated murder.

## III. THE TRIAL COURT ERRED IN DETERMINING THAT THE STATE DEMONSTRATED INSUFFICIENT EVIDENCE FOR AN ALTERNATIVE CHARGE OF FELONY MURDER

¶ 39 We also granted review to determine whether the State demonstrated that the homicide was accomplished in the course of committing the kidnapping as a predicate

25. *Johnson*, 740 P.2d at 1268.

26. *Id.*

27. 850 P.2d 1232 (Utah 1993).

28. *Id.* at 1244–45.

29. *Id.*

30. Utah Code Ann. § 76–5–202(1), –301(1).

offense pursuant to Utah Code section 76–5–203(2)(d) (2005), which provides that

> (2) [c]riminal homicide constitutes murder if:
>
> . . . .
>
> (d) (i) the actor is engaged in the commission, attempted commission, or immediate flight from the commission or attempted commission of any predicate offense, or is a party to the predicate offense.

Under subsection (1), the statute lists the "predicate offenses," which in this particular case include kidnapping.[31] The State argues that the trial court erred in refusing to bind Graham over under the section 76–5–203(2)(d) felony murder rule as an alternative to aggravated murder. We agree.

¶ 40 The trial court erroneously concluded that the homicide did not occur "in the commission, attempted commission, or immediate flight from the commission or attempted commission of the predicate offense."[32] The language of both the aggravated murder statute of section 76–5–202(1)(d) and the felony murder statute of section 76–5–203 leads us to the same textual and legal analysis. First, the phrases "while the actor is engaged in" from the aggravated murder statute and "the actor is engaged in the commission of" from the felony murder statute share the same meaning. Because they are essentially synonymous, we also apply the *Johnson* and *Archuleta* analysis to the phrase "engaged in the commission of." Thus, we conclude that the homicide and kidnapping at issue in this case were likewise inextricably intertwined to represent "a continuity of action over a span of time."[33]

¶ 41 As a result, we hold that because the State demonstrated sufficient probable cause that the homicide was accomplished in the course of committing the kidnapping as a predicate offense pursuant to section 76–5–203(2)(d), in the alternative to aggravated murder, the trial court at least should have bound Graham over on the charge of felony murder.

---

IV. THE ISSUES RAISED CONCERNING UTAH CODE SECTION 76–5–202(1)(F) ARE MOOT BECAUSE THE STATE HAS DROPPED THE CHARGE

¶ 42 It is unnecessary for us to address whether Graham's departure from the group home may be construed as "pecuniary or other personal gain" under Utah Code section 76–5–202(1)(f) (2005) because the State withdrew it as an aggravating factor. Consequently, we need not address whether that section is unconstitutionally vague or overbroad.

## CONCLUSION

¶ 43 Graham's actions constituted the elements of both kidnapping and aggravated murder independently of one another. The State satisfied the appropriate mental state for aggravated murder by demonstrating that Graham "intentionally or knowingly" committed the homicide. The State presented sufficient evidence, pursuant to our aggravated murder statute, to reasonably conclude that Graham committed the homicide while "engaged in the commission of" the kidnapping. Likewise, the State demonstrated sufficient evidence to reasonably conclude, in the alternative to aggravated murder, that Graham committed felony murder. We accordingly reverse in part and affirm in part the orders of bindover and remand for further proceedings consistent with the law as expressed herein.

———

¶ 44 Chief Justice DURHAM, Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Associate Chief Justice WILKINS' opinion.

---

**31.**   Utah Code Ann. § 76–5–203(1) (2005).

**32.**   *Id.* § 76–5–203(2)(d)(i).

**33.**   *State v. Archuleta,* 850 P.2d 1232, 1245 (Utah 1993).