IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| State of Utah, | ) | OPINION |
| | ) | |
| Plaintiff and Appellee, | ) | Case No. 20080908-CA |
| | ) | |
| v. | ) | F I L E D |
| | ) | (January 6, 2012) |
| Trevor Merrill, | ) | |
| | ) | 2012 UT App 3 |
| Defendant and Appellant. | ) | |

-----

Third District, West Jordan Department, 071400722
The Honorable Mark S. Kouris

Attorneys:     Nathan N. Jardine and Stephen W. Howard, Salt Lake City, for
              Appellant
              Mark L. Shurtleff and Jeanne B. Inouye, Salt Lake City, for Appellee

-----

Before Judges McHugh, Orme, and Thorne.

THORNE, Judge:

¶1     Defendant Trevor Merrill was charged with criminal homicide, child abuse homicide, a third degree felony, *see* Utah Code Ann. § 76-5-208 (2003), and reckless endangerment, a class A misdemeanor, *see id.* § 76-5-112.[1]  Merrill seeks interlocutory

---

[1]Echo Nielsen was also charged with criminal homicide, child abuse homicide, and reckless endangerment in this case.  Likewise, Nielsen appeals from the district court's bindover decision.  Because she raises additional arguments in her appeal it is handled in a separate decision.

review of the district court's denial of his motion to quash the bindover on those charges.  We affirm.


BACKGROUND

¶2      On August 18, 2006, Merrill went to sleep in the same bed with his three and a half month old son and the infant's mother Echo Nielsen.[2]  The infant was allegedly situated between Merrill and Nielsen.[3]  Sometime later, Merrill woke to discover that the infant was not breathing.  Merrill attempted to perform CPR on the infant and

---

[2]The parties use the term co-sleeping to describe this sleeping arrangement.  We acknowledge that there are other terms to describe this arrangement but for simplicity elect to use the same term as the parties.

[3]Regarding the infant's sleeping position, the State proffered the testimony of Detective Eric Anderson, Officer Michelle Chase, and Detective Alexis Van Wagoner.  The State asserts that Detective Anderson would testify that

> [Merrill] said the baby was on his chest, but that [Nielsen]
> told the detective that she took the child to bed with her, that
> [Merrill] joined shortly after she took the child to the bed,
> . . . .  That [Nielsen] was on the right side and that [Merrill]
> was on the left side and that [the child] was in between
> them, on his back.  And that they had laid a blanket on top
> of [the child].

The State proffered testimony of Officer Chase that when she encountered Merrill in the home, he had a bloody nose and blood on his shirt and had explained that his father had given him the bloody nose, and that Officer Chase would testify that "Merrill told Officer Chase that he had the baby, . . . on his chest and that when [Merrill] woke up, that's when he realized the child wasn't breathing."  The State further proffered that Detective Van Wagoner would testify that

> [s]he observe[d]–[Detective Van Wagoner] observe[d] blood
> on the baby's face and [Merrill] said the baby was on his
> chest.  It's unclear from the police report whether that means
> that the baby was on the baby's chest or whether the baby
> was lying chest-to-chest or that the baby was lying with the
> baby's back to the father's chest.  That's unclear.

emergency personnel were called. The infant died. Utah State Deputy Chief Medical Examiner Edward A. Leis, M.D. performed an autopsy on the infant. Dr. Leis listed several possible pathologic diagnoses in the examination report including positional asphyxia, aseptic (chronic) meningitis, and premature birth at thirty-three weeks gestation. Ultimately, Dr. Leis certified the cause and manner of death as undetermined.

¶3      In 2007, both Merrill and Nielsen were charged with criminal homicide, child abuse homicide and reckless endangerment. The magistrate held a consolidated preliminary hearing wherein the State's witnesses Dr. Leis, Dr. Valerie Rahaniotis,[4] and Trevor Merrill's father, Steven Merrill, testified. The State also proffered the testimony of four other witnesses.

¶4      Dr. Leis testified that, in his opinion, the most likely cause of death was "positional asphyxia based upon the age of the child and the fact that [the child] was originally placed on [his] back and now [the child is] found in a face-down position on a bed." Dr. Leis explained that the reason he certified the cause and manner of death as undetermined was because he could not

> say with certainty that one event most likely explains the
> death as opposed to the other. I guess I phrased that wrong.
> I can't say with certainty that I would say a specific event
> that took place caused the death of this individual, even
> though earlier, I said most likely it was positional asphyxia,
> the presence of aseptic meningitis as a risk factor for causing
> the death of this child, even though slim, is still a possibility
> and I can't make a distinction between those two events, and
> therefore, I certified it as undetermined causes.

Thereafter, the State requested time to prepare and submit its closing arguments to the court, which the magistrate granted and scheduled a subsequent oral argument hearing. After oral arguments, the magistrate found sufficient evidence to support the probable cause statement and bound the two defendants over for trial on both charges.

---

[4]Dr. Rahaniotis was the infant's pediatrician, who last examined the infant on August 18, 2006.

¶5 Both Merrill and Nielsen asked the district court to quash their bindovers arguing insufficiency of the evidence and other constitutional issues. The court conducted oral arguments on the parties' motion to quash. The court determined that the State had met the low burden of a preliminary hearing and denied the defendants' motion to quash. Both Merrill and Nielsen appeal. We address Merrill's appeal in this decision.

ISSUES AND STANDARDS OF REVIEW

¶6 Merrill claims that the district court erred in denying his motion to quash the bindover on the child abuse homicide charge, arguing first that the court improperly permitted Dr. Leis's testimony, second that there was no evidence to demonstrate that Merrill actually caused the death, and third that there was no evidence that he had abused the infant. Merrill also argues that the court should have quashed the bindover on the reckless endangerment charge because first, the State did not establish that co-sleeping created a substantial and unjustifiable risk of death and second the State did not show that Merrill's actions constitute a gross deviation from a standard of care that an ordinary person would exercise. Finally, Merrill argues that both charges should be quashed because the court violated his rights under the equal protection and due process clauses of the United States Constitution and the Utah Constitution by placing him in a separate class from the general public by finding that the risk he created by co-sleeping with the infant was significantly higher than other parents who co-sleep with their infants.

¶7 "To support bindover the [s]tate must establish probable cause. In order to establish probable cause, the [state] must produce evidence sufficient to support a reasonable belief that the defendant committed the charged crime." *State v. Droesbeke*, 2010 UT App 275, ¶ 13, 241 P.3d 772 (alterations in original) (internal quotation marks omitted). "This matter presents a mixed question of law and fact because a decision to bind a defendant over for trial includes the application of the appropriate bindover standard to the facts presented in [this] case." *Id.* ¶ 14 (alteration in original) (internal quotation marks omitted). "[I]n reviewing a . . . bindover decision, [we] should afford the [lower court's] decision limited deference." *Id.* (second and third alterations and omission in original) (internal quotation marks omitted).

ANALYSIS

¶8     Merrill asserts that the district court made numerous errors in denying his motion to quash the bindover on the child abuse homicide and reckless endangerment charges. The Utah Supreme Court has explained on several occasions what review of the bindover should constitute. "To bind a defendant over for trial, the State must show probable cause at a preliminary hearing by present[ing] sufficient evidence to establish that the crime charged has been committed and the defendant committed it." *State v. Graham*, 2006 UT 43, ¶ 17, 143 P.3d 268 (alteration in original) (internal quotation marks omitted). "[T]he prosecution has the burden to produce believable evidence of all the elements of the crime charged, but this evidence does not need to be capable of supporting a finding of guilt beyond a reasonable doubt." *State v. Virgin*, 2006 UT 29, ¶ 20, 137 P.3d 787 (internal quotation marks omitted). The quantum of evidence required to support a probable cause finding in a preliminary hearing is "relatively low," *see State v. Clark*, 2001 UT 9, ¶ 10, 20 P.3d 300. "[T]he quantum of evidence necessary to support a bindover is less than that necessary to survive a directed verdict motion." *Id.* ¶ 16.

¶9     To determine whether the evidence supports a reasonable belief that the defendant committed each element of the crime, "[t]he magistrate must view all evidence in the light most favorable to the prosecution and must draw all reasonable inferences in favor of the prosecution." *Id.* ¶ 10 (alteration in original) (internal quotation marks omitted). The court should bind the defendant over for a trial "unless the evidence is wholly lacking and incapable of reasonable inference to prove some issue which supports the [prosecution's] claim." *In re I.R.C.*, 2010 UT 41, ¶ 16, 232 P.3d 1040 (alteration in original) (internal quotation marks omitted). With these principles in mind, we address Merrill's bindover issues.

I. Bindover on the Child Abuse Homicide Charge

¶10     Merrill argues that the district court should have quashed the bindover on the child abuse homicide charge because the court improperly allowed Dr. Leis's testimony and that there was no evidence that Merrill actually caused the death nor that he abused the infant. Utah Code section 76-5-208(1) provides that a person commits child abuse homicide if the individual causes the death of a person under eighteen and the death results from child abuse as defined in section 76-5-109(1)(c). *See* Utah Code Ann. § 76-5-

208(1) (2003). Injurious conduct to a child done as a result of criminal negligence constitutes child abuse under the statute. *See id.* § 76-5-208(1)(b).

A. Admissibility of Dr. Leis's Medical Testimony

¶11   Merrill first argues that the district court improperly admitted Dr. Leis's testimony because Dr. Leis could not testify to a reasonable degree of medical certainty with regard to either the cause or manner of the infant's death. Merrill claims that reasonable medical certainty is a threshold prerequisite for admissibility. In support of this claim, Merrill asserts that Utah courts have not directly analyzed the relationship between a reasonable degree of medical certainty and the probable cause requirement of the preliminary hearing when making earlier decisions about admissibility. Merrill argues that reasonable medical certainty is a necessary threshold prerequisite that many other jurisdictions recognize.[5] Merrill urges us to analyze the admissibility question, arguing that a closer look will result in a different decision.

¶12   The Utah Supreme Court has, however, considered and allowed medical examiner testimony in instances, similar to the case at hand, where the medical examiner could not testify to a reasonable degree of medical certainty with regard to the cause of death. *See State v. Talbot*, 972 P.2d 435 (Utah 1998). In *State v. Talbot*, 972 P.2d 435 (Utah 1998), the medical examiner testifying at a preliminary hearing could not conclude to a *medical certainty* that the child's injuries were the result of human causes instead of a fall from her bunk bed. *See id.* at 438. The supreme court found that this "fact [did] not call into question the examiner's opinion that [the child's] death was the result of massive craniocerebral injuries inflicted upon her by an outside human force,

---

[5]None of the cases Merrill cites apply the reasonable degree of medical certainty as a threshold prerequisite for admissibility in the criminal preliminary hearing context at issue in this case. *See Fitzgerald v. Manning*, 679 F.2d 341 (4th Cir. 1982) (civil medical malpractice directed verdict case); *Marron v. Stromstad*, 123 P.3d 992 (Alaska 2005) (civil negligence case); *Palace Bar, Inc. v. Fearnot*, 381 N.E.2d 858 (Ind. 1978) (civil wrongful death case); *Scott v. Blue Springs Ford Sales, Inc.*, 215 S.W.3d 145 (Mo. Ct. App. 2006) (civil damages case); *Klimple v. Bahl*, 2007 ND 13, 727 N.W.2d 256 (civil damages case); *McMahon v. Young*, 276 A.2d 534 (Pa. 1971) (civil causation case); *Porter v. Green*, 745 S.W.2d 874 (Tenn. Ct. App. 1987) (civil causation and damages case); *Spruill v. Commonwealth*, 271 S.E.2d 419 (Va. 1980) (criminal case at trial stage).

to a degree that the opinion would not support a jury verdict." *Id.* The supreme court noted that the state had presented evidence that the defendant was the only adult present with the capacity to inflict the injuries the child sustained. *See id.* at 439. Instead of requiring that the medical examiner's opinion evidence be rendered to a degree of medical certainty before it could be admitted, the supreme court permitted the magistrate to consider the evidence. *See id.* at 438-39. The supreme court observed that the magistrate must resolve all inferences in favor of the prosecution and reiterated that "uncertaint[ies] regarding the cause of death" "'should [be] left for the fact-finder to resolve at trial.'" *Id.* at 439 (second alteration in original) (quoting *State v. Jaeger*, 896 P.2d 42, 45 (Utah Ct. App. 1995)).

¶13 Additionally, the supreme court has found that, in a criminal prosecution, a defendant should be allowed to introduce expert medical opinion evidence that does not rise to a reasonable medical certainty but is, instead, based on a probability, possibility, or likelihood, where the witness expresses statements in language which sufficiently represents his or her own best judgment to a reasonable certainty. *See State v. Jarrell*, 608 P.2d 218, 231-32 (Utah 1980). In *State v. Jarrell*, 608 P.2d 218 (Utah 1980), the supreme court discussed the general rule regarding the certainty of an expert's opinion. *See id.* at 230. The supreme court reiterated that an expert medical opinion may be admitted at trial when it is "based on a probability, possibility, or likelihood . . . whe[n] the witness[] expresse[s] statements in language which sufficiently represented [his or her] own best judgment to a reasonable certainty." *Id.* (considering the issue of whether the trial court erred in requiring defense counsel to phrase his question to a medical expert in terms of a "reasonable medical certainty or probability").

¶14 Applying these principles to this case, we determine that the district court did not err in concluding that the medical examiner's testimony of the manner and cause of the infant's death need not, in this instance, reach a level of reasonable medical certainty before it may be admitted. In this case, Dr. Leis expressed his diagnosis in terms of probability and testified that, based on his best judgment, the most likely cause of death was positional asphyxia. Dr. Leis explained how he arrived at this "most likely cause of death" diagnosis and why he could not confirm such with a reasonable medical

certainty.[6] Dr. Leis's testimony was conveyed in language which sufficiently represented his best judgment based on knowledge garnered from his training and professional experience.[7] Because Dr. Leis stated his opinion in terms of probability based on his best judgment, such testimony is admissible. *See id.* Under *Talbot*, any remaining uncertainties regarding the infant's cause of death do not render Dr. Leis's testimony inadmissible. Instead, any such uncertainties should be left for the trier of fact to resolve. As a result, we determine that the district court did not err by admitting Dr. Leis's testimony.

B. Sufficiency of the Causation Evidence

¶15    Merrill next argues that even if Dr. Leis's testimony is admissible, it is speculative at best and as such the State presented insufficient evidence to demonstrate that Merrill actually caused the infant's death. To begin, we first consider whether Dr. Leis's testimony that the most likely cause of the infant's death was positional asphyxia is speculative. "Whether [an expert opinion] may be [asserted] merely in terms of possibility depends on how closely possibility resembles speculation; so that ordinarily the opinion should at least be stated in terms of probability if not absolute certainty." *Jarrell*, 608 P.2d at 230 (internal quotation marks omitted). "When the correlation between the predicate facts and conclusion is slight, then the inference is less reasonable, and at some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation." *State v. Hester*, 2000 UT App 159, ¶ 17, 3 P.3d 725 (internal quotation marks omitted), *abrogated in other part by State v. Clark*, 2001 UT 9, ¶ 14, 20 P.3d 300.

---

[6]Dr. Leis testified that he
> said most likely [the cause of death] was positional asphyxia, the presence of aseptic meningitis as a risk factor for causing the death of this child, even though slim, is still a possibility and I can't make a distinction between those two events, and therefore, I certified it as undetermined causes.

[7]In his testimony, Dr. Leis explained his report and examination of the infant, the possible ways in which an infant may die from asphyxiation, his personal observations of lividity patterns in infants, his knowledge of the developmental milestones and their relevance to the case at hand, and each of the possible causes of the infant's death.

¶16    Here, Dr. Leis, in compliance with the principles outlined in *Jarrell*, conveyed his testimony regarding the possible cause of the infant's death, stating that in his opinion the most likely cause of death was "positional asphyxia based upon the age of the child and the fact that [the child] was originally placed on [his] back and now [the child is] found in a face-down position on a bed." Dr. Leis explained that the reason he certified the cause and manner of death as undetermined was because he could not say with medical certainty that the infant died from positional asphyxia because the presence of aseptic meningitis, though a slim chance, was still a possibility. Dr. Leis's testimony sufficiently represented his best judgment based on knowledge acquired from his training and professional experience. Additionally, the nexus between the evidence that the infant died in a face-down position despite being too young to roll over by himself and the conclusion that some external force had to be applied that shifted the infant into a face-down position, when viewed in the light most favorable to the prosecution, is not so tenuous that we consider it speculative.

¶17    Having determined that Dr. Leis's testimony was not speculative, we next consider whether the State presented sufficient evidence to demonstrate that Merrill actually caused the infant's death. At the preliminary hearing, the State presented evidence that the infant was originally placed on his back in the bed between Merrill and Nielsen. When Merrill woke, the infant was not breathing and was found in a face-down position. Dr. Leis testified that the lividity pattern he observed in the infant demonstrates that the infant,[8] originally placed on his back, died in a face-down position. Dr. Leis further testified that the infant was too young to turn himself over from his back to his stomach, so some external force had to be applied that shifted the infant into a face-down position. The State proffered testimony of a family member that Merrill and Nielsen were heavy sleepers, which sound sleeping necessitated the assistance of another person to provide care for the infant during the night. This evidence, when viewed in a light most favorable to the prosecution and drawing all reasonable inferences in favor of the prosecution, supports a reasonable inference that

---

   [8]Lividity, as Dr. Leis explained, refers to the discoloration of the skin caused by the settling of blood in the body, after death, which discoloration is used in determining the position of a body at the time of death. Dr. Leis further explained that, in his experience, lividity patterns develop and become fixed much faster in infants and that such lividity patterns could develop and become fixed up to an hour after an infant's death.

Merrill actually caused the infant to stop breathing by co-sleeping, and allowing Nielsen to co-sleep with the infant, wherein the infant was shifted from his back to his stomach.

¶18    On this basis, we conclude that the evidence is not unduly speculative and supports a reasonable inference that Merrill caused the infant's death sufficient to bind Merrill over on the child abuse homicide charge. Whether said evidence is sufficient to prove causation beyond a reasonable doubt is a separate question, one that is left to the trier of fact. *See In re D.K.*, 2006 UT App 461, ¶ 11, 153 P.3d 736.

C.  Sufficiency of the Child Abuse Evidence

¶19    Merrill additionally argues that there is no evidence to demonstrate that he abused the infant, without which evidence he cannot be bound over on the child abuse homicide charge. Child abuse "means any offense described in Subsection (2)," which section provides that "[a]ny person who inflicts upon a child serious physical injury or, having the care or custody of such a child, causes or permits another to inflict serious physical injury upon a child is guilty of an offense as follows: . . . (c) if done with *criminal negligence*[.]" Utah Code Ann. § 76-5-109(1)(c), (2)(c) (Supp. 2006) (emphasis added). A person engages in conduct with

> criminal negligence or is criminally negligent with respect to circumstances surrounding his conduct or the result of his conduct when he *ought to be aware of a substantial and unjustifiable risk* that the circumstances exist or the result will occur. The risk must be of a nature and degree that the *failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise in all the circumstances as viewed from the actor's standpoint.*

*Id.* § 76-2-103(4) (2003) (emphases added).

¶20    Merrill asserts that he did not commit child abuse because co-sleeping with an infant does not create a substantial and unjustifiable risk of injury or death to an infant nor does it constitute a gross deviation from the standard of care that an ordinary person would exercise. Merrill claims that co-sleeping with an infant presents no greater risk than that of transporting an infant in a car. In support of this claim, Merrill

asserts that the percentage of the total population dying in motor vehicle accidents is just over 0.013%, while the percentage of infants, in 2006, who died of suffocation in bed was just under 0.0006%.[9]  Merrill argues that any risk from his decision to co-sleep with and permit Nielsen to co-sleep with the infant was justified by the benefits of co-sleeping.  Relying on Dr. Leis's preliminary hearing testimony, Merrill also claims that because approximately 25-50% of parents are co-sleeping with their infant or young children, the practice of co-sleeping cannot be a gross deviation from the standard of care.

¶21    The State asserts that Merrill's statistical comparisons are not entirely accurate,[10] not supported, and not necessarily applicable because the State is not asserting that any two sleepers whose infant dies of positional asphyxiation are negligent for sleeping with the infant.  Rather, what is claimed is that these two individuals co-sleeping with an infant under the circumstances in this case posed a substantial risk to the infant.  The State asserts that the circumstances in this case—that Merrill and Nielsen were heavy

---

[9]Merrill obtained this comparison from statistics outlined in a Department of Health publication, *Vital Statistics Births and Deaths 2006*.  Merrill submitted this publication into evidence as Defense Exhibit #1.

[10]The State asserts that Merrill did not accurately calculate the percentage of infants who die of suffocation each year, which percentage is more accurately 0.006% and not 0.0006% based on the statistic of three deaths out of 53,475.  The State also asserts that this statistic does not accurately reflect the number of infant suffocation deaths because, Dr. Leis testified, that number does not include sudden infant death syndrome deaths.

The State further asserts that Merrill overstates the evidence presented regarding the percentage of parents who co-sleep with either an infant or child.  The State clarifies that defense counsel questioned Dr. Leis about the percentage of parents who co-sleep with their infant.  Dr. Leis responded that he was not aware of the exact statistic. Defense counsel, then asked, "But overall, the percentage of parents who practice co-sleeping is somewhere between 25 and 50 percent?"  Dr. Leis responded, "That's probably reasonable."  Such percentage, the State asserts is not useful because it does not reveal how many parents actually co-sleep with an infant as opposed to an older child.

sleepers[11] who had previously accidentally caused the death of an infant after having been put to bed lying on her back between Merrill and Nielsen—[12] demonstrate that Merrill's co-sleeping decision posed a substantial risk of death to the infant. Further, that an ordinary person, viewing the circumstances from Merrill's standpoint, would not co-sleep with another infant or allow another person to do so.

¶22    Although many parents may successfully co-sleep with an infant, the risks associated with co-sleeping will likely vary based on the circumstances, i.e., the presence or absence of asserted risk factors. The circumstances in this case demonstrate that Merrill and Nielsen were heavy sleepers that had not awoken when one or the other previously accidentally caused the death of their infant daughter who was co-sleeping between them. A magistrate could reasonably infer from this evidence that Merrill, by establishing the same sleeping environment with his infant son that accidentally caused the previous death of an infant daughter, created a substantial and unjustifiable risk that the infant son would be seriously physically injured. We recognize that there is no statistical evidence to demonstrate that a previous death by co-sleeping is, in fact, a risk factor associated with an increased risk of death by co-sleeping. However, the magistrate must view the evidence in the light most favorable to the prosecution and must draw all reasonable inferences in favor of the prosecution. *See State v. Robinson*, 2003 UT App 1, ¶ 5, 63 P.3d 105. With these principles in mind, it is reasonable for the magistrate to infer that by creating the same sleeping environment for the infant son, without making any effort to decrease the risk factors that accidentally caused the death of an infant daughter, there was a substantial and unjustifiable risk of serious physical injury to the infant.

¶23    In the alternative, Merrill argues that any risk he created by co-sleeping with the infant was not of a "nature and degree that the failure to perceive it constitutes a gross

---

[11]In support of this assertion the State proffered evidence that Nielsen's sister, Jessie Campbell, would testify at trial that she was the primary caretaker of the infant and that because both Merrill and Nielsen were heavy sleepers, Campbell would usually get up with the infant when he woke up at night.

[12]Merrill mentions in his brief that his defense counsel, in the preliminary hearing, objected to admission of evidence relating to the previous co-sleeping death of his infant daughter. Other than this reference to a previous objection, Merrill does not provide any argument that the district court erred in admitting said evidence.

deviation from the standard of care that an ordinary person would exercise in all the circumstances as viewed from the actor's standpoint." *See* Utah Code Ann. § 76-2-103(4). The State presented evidence of the previous co-sleeping death and testimony from Dr. Leis who stated that "if I knew that I had a previous infant that died while sleeping in the same bed as me, . . . I wouldn't take that risk [with] future children, and [I] would place them some place safe . . . ." Based on the evidence presented in this case, the magistrate could reasonably infer that an ordinary person, who like Merrill was a heavy sleeper that did not wake when he accidentally caused the death of an infant daughter, would not co-sleep with another infant in the same sleeping environment that accidentally caused a previous co-sleeping death. As a result, we determine that the magistrate correctly concluded that the State had demonstrated that Merrill's conduct constituted a gross deviation from the standard of care that an ordinary person would exercise under the circumstances.

¶24    Thus, we affirm the district court's decision to bind Merrill over on the child abuse homicide charge.

## II.  Bindover on the Reckless Endangerment Charge

¶25    Merrill also challenges the bindover of the reckless endangerment charge. In Utah, a person commits reckless endangerment if "under circumstances not amounting to a felony offense, the person recklessly engages in conduct that creates a substantial risk of death or bodily injury to another person." Utah Code Ann. § 76-5-112(1) (2003). A person engages in conduct recklessly

> when he is *aware of but consciously disregards a substantial and unjustifiable risk* that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*Id.* § 76-2-103(3) (emphasis added).

¶26    Merrill's first of two arguments essentially advances the same issues as the criminal negligent conduct discussed above in the child abuse homicide section of this opinion. The difference between "reckless and criminally negligent conduct is that under the former, one perceives a risk and consciously disregards it, whereas under the

latter, one fails to even perceive the risk . . . . The distinction, then, is merely one of the degree of perception of the risk." *State v. Robinson*, 2003 UT App 1, ¶ 6 n.2, 63 P.3d 105 (internal quotation marks omitted). Merrill neither asserts that he was unaware of the risk nor attempts to refute that the evidence presented demonstrates that he was aware of the risk his actions posed.[13] Instead, Merrill again asserts that the State failed to present evidence sufficient to prove the magnitude of the risk itself and that his action does not constitute a gross deviation from the standard of care that an ordinary person would exercise. Because we have previously rejected those arguments as they pertain to criminal negligence, a requirement similar to recklessness, we need not address the same arguments in the context of reckless endangerment. As such, we affirm the district court's conclusion that the State presented sufficient evidence of both the actual risk to this infant and the perception of risk.

¶27 Secondly, Merrill argues that the court violated his rights under the Equal Protection Clause of the federal constitution and the Uniform Operation of Laws Clause of the Utah Constitution and his parental decision-making rights under the Due Process Clause of the federal constitution, by placing Merrill in a separate class from the general public by finding that the risk he created by co-sleeping with the infant was significantly higher than other parents who co-sleep with their infants. To begin with, Merrill does not explain how evaluating the evidence under the statutory definitions of criminal negligence and recklessness—requiring that the individual's disregard or failure to perceive the risk "constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint," Utah Code Ann. § 76-2-103(3); *see also id.* § 76-2-103(4)—equates to impermissibly placing him in a separate class. Nor does Merrill provide supporting authority or analysis as required by rule 24(a)(9) of the Utah Rules of Appellate Procedure to support this argument. *See* Utah R. App. P. 24(a)(9). Rather, Merrill quotes the relevant constitutional provisions and a few cases regarding statutory classifications. He does not, however, provide any meaningful analysis of the cases or for his claim that the district court impermissibly placed him in a separate class when it merely applied statutory provisions requiring the court to view the evidence under the

---

[13]In his discussion regarding the risk elements of the reckless endangerment charge, Merrill mentions only that evidence of the previous death of his infant daughter "must be restricted in its purpose—to show the subjective element of perception of the risk. Evidence of [his infant daughter's] death does not constitute evidence of the objective element of the magnitude of the risk."

circumstances *as viewed from the actor's standpoint*. "Briefs must contain reasoned analysis based upon relevant legal authority. An issue is inadequately briefed when the overall analysis of the issue is so lacking as to shift the burden of research and argument to the reviewing court." *Brussow v. Webster*, 2011 UT App 193, ¶ 10, 258 P.3d 615 (internal quotation marks omitted), *cert. denied*, No. 20110715 (Utah Nov. 28, 2011); *see also* Utah R. App. P. 24. This court has consistently declined to address federal and state constitutional claims that have been inadequately briefed. *See State v. Garner*, 2002 UT App 234, ¶¶ 7, 12, 52 P.3d 467. Because Merrill's claims are devoid of any meaningful analysis, we decline to address them.


CONCLUSION

¶28    Merrill asserts that the district court improperly admitted Dr. Leis's testimony. Utah courts have previously approved of experts relying on their training and knowledge to provide opinions that do not amount to medical certainty, *see State v. Jarrell*, 608 P.2d 218, 230 (Utah 1980). The supreme court has explained that uncertainties regarding the manner and cause of death should be left for the fact-finder to resolve at trial. *See State v. Talbot*, 972 P.2d 435, 439 (Utah 1998). As such, we conclude that the district court did not err by admitting Dr. Leis's testimony, notwithstanding Dr. Leis's acknowledgment that he could not express an opinion as to the manner and cause of death to a medical certainty.

¶29    Merrill next asserts that the State did not present sufficient credible evidence to demonstrate that he caused the infant's death. Dr. Leis's testimony regarding the circumstances of the infant's death were based on his training and experience and therefore not so tenuous that we call it speculation. We conclude that the State has presented sufficient credible evidence to support a reasonable inference that Merrill caused the infant to die.

¶30    Merrill then argues that the district court erred in binding him over on the child abuse homicide and reckless endangerment charges. The State presented evidence that, when viewed in the light most favorable to the prosecution, demonstrates that Merrill's action of co-sleeping with his infant son created a substantial and unjustifiable risk of serious physical injury or death. Based on this evidence, a magistrate could reasonably conclude that an ordinary person, viewing the circumstances from Merrill's standpoint would not co-sleep with an infant or allow another to do so. As a result, we conclude

that the district court did not err by finding that Merrill acted with criminal negligence and binding Merrill over on the child abuse and reckless endangerment charges.

¶31     Merrill lastly argues that the district court violated his due process and equal protection rights under the State and Federal constitutions by placing Merrill in a separate class from the general public.  Merrill does not explain how evaluating the evidence under the statute impermissibly places him in a separate class, nor does he provide supporting authority or analysis to support his constitutional arguments.  We, therefore, decline to address these arguments because of inadequate briefing.

¶32     We affirm the district court's decision to deny Merrill's motion to quash the bindover on the child abuse homicide and reckless endangerment charges.


_____
William A. Thorne Jr., Judge


                                    -----


¶33     WE CONCUR:



_____
Carolyn B. McHugh,
Presiding Judge



_____
Gregory K. Orme, Judge